**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Clarence E. BRAASCH et al.,
Defendants-Appellants.**

**Nos. 74–1000 thru 74–1017 and 74–1105.**

United States Court of Appeals,
Seventh Circuit.

Argued June 5, 1974.

Decided Oct. 23, 1974.

George J. Cotsirilos, David P. Schippers, R. Eugene Pincham, Patrick A. Tuite, Harry J. Busch, Gerald M. Werksman, Eugene T. Noonan, William J. Nellis, Chicago, Ill., for defendants-appellants.

James R. Thompson, U. S. Atty., Gary L. Starkman, Dan K. Webb and James F. Holderman, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before CLARK, Associate Justice,* and FAIRCHILD and STEVENS, Circuit Judges.

CLARK, Associate Justice.

This prosecution, brought under the extortion statute, 18 U.S.C. § 1951,[1] depicts a betrayal of public trust of the most alarming type to a free society: the corruption of the entire vice squad of the 18th Police District of Chicago over a period of many years.

The indictment covers the period from 1966 to 1970 during the tenure of Captain Clarence E. Braasch as Commander of the 18th Police District and names as coconspirators more than two dozen police officers who were attached to the 18th District during all or part of that period, including Braasch and three vice

---

* Honorable Tom C. Clark, Associate Justice (Retired) of the Supreme Court of the United States, is sitting by designation.

1.  18 U.S.C. § 1951:
    (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by * * * extortion or attempts or conspires so to do, * * * shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section—* * *
(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.
(3) The term "commerce" means * * * all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof * * *.

coordinators, Sergeants Fischer, Barry and Geraghty. The facts are "stranger than fiction",[2] revealing a brazen extortion scheme involving a shakedown of some 53 bars, taverns and other business establishments serving alcoholic beverages and located within the District. Initially, four police officers on the vice squad—two during daylight hours and two at night—collected $100 to $150 per month from each of such establishments and divided this money, known as the "package", among the members of the vice squad. The *quid pro quo* on the part of the police officers was that they would "protect" the victims of the scheme—known as the "vice club" or "little club"—from enforcement of various regulatory laws and from loss of business revocation of licenses and other disturbances, some of which were caused by manufactured police harassment.

In the regular operation of the "little club", a vice coordinator would obtain from the police officers of the vice squad a monthly list of the establishments that might be included in the club's collections and present this list to Captain Braasch who would then strike from it the names of those establishments that he decided should be excluded for various reasons. The resulting list contained the names of the club "members" until the next month's list was approved.

From the testimony, it appears that a similar "club" existed in the district at least as far back as 1961, but abruptly ceased operations in the middle of 1966 when Captain James Holzman was appointed District Commander. The rapid change of command from Holzman to Captain Braasch in August 1966 marked the beginning of the conspiracy at bar.

Braasch brought with him Sergeant Robert Fischer to be his new Vice Coordinator. Soon after Braasch and Fischer began their new assignments, one Bill Gold, representing certain nightclub and gambling interests in the 18th Police District, telephoned Fischer that he wanted to see him about some business that might be of interest to him and his boss, Captain Braasch, and left his telephone number. Fischer reported the call to Braasch, who told him to see Gold. At lunch the next day, Gold told Fischer that he would pay Captain Braasch $3,600 per month to protect gambling operations in the 18th District from police harassments and arrests, and, in addition, he would pay $1,500 per month for Braasch to protect ten specific night spots also in the 18th District.

Fischer reported to Braasch, who promptly accepted the offer. This arrangement, known as the "big ten" or the "big club", started in operation in October, 1966, and continued at least during Braasch's tenure as Commander of the 18th District which ended in 1970. For some 27 months during the operation, Fischer acted as "bagman" for Braasch. The money was collected first from Gold and, after his death, from one Glitta, and ran as high as $6,810 a month. Initially, some of the money was passed on to key police officers, such as Braasch's friend, Barry, a group of Captains and Lieutenants, and two vice squad officers, Cello and Rifkin. The latter two were included because as Fischer testified, "the only two vice men . . . we would have to worry about would be Rifkin and Cello because they were assigned to work gambling on day . . . ."[3] Fischer was succeeded by Barry as "bagman"

2. Byron, *Don Juan*, Canto XIV, St.101.

3. After these payments Braasch and Fischer split the balance equally between themselves, except $100 which was given by Gold and Glitta to Fischer as a "tip". During the period that Fischer acted as "bagman", the total payoffs amounted to some $185,000.

Braasch received in total about $85,000, and Fischer about $25,000. Barry first received $100 a month as a favor from Braasch, but later $1000 a month when he became Vice-Coordinator; the Captains as a group received $500 a month; the Lieutenants $600 a month; and Cello and Rifkin $200 each per month.

for the "big club", but the record does not show the take during that period.

In November of 1966, some of the members of the Vice Squad approached Fischer with regard to their resumption of the pre-Holzman practice of collecting monies from retail liquor establishments in the District. The word about the "big club" had gone the rounds of the Vice Squad and its members were anxious to share in the proceeds. When Fischer made it clear that Braasch would not be sharing the payoffs from the "big club"; it was suggested that the Vice Squad police officers organize their own "club" among the remaining bars and taverns in the District. Fischer then took this matter up with Braasch who agreed to the proposal. According to Fischer's testimony, when Braasch was apprised of the proposed "club", he commented: "I guess it is not a bad idea if these guys want to make a buck for themselves. We got our own thing going, haven't we?" Braasch's primary concern was that he have a veto power over which establishments would be included.

Braasch was interested not only in making sure that none of the nightclubs in his own "big ten" were being shaken down by the Vice Squad, but also in keeping off the list any "trouble spots" —establishments that catered to prostitutes, operated after hours, or served minors—which might prove embarrassing if the public insisted on police action. Pragmatically, Braasch and Fischer decided not to share in the proceeds of the "little club" for reasons related by Fischer in his testimony. According to Fischer, he told Braasch, when they were privately discussing the "little club" arrangement:

[I]f there is any complaints on these places and there has to be an arrest made, why, if we weren't taking money from it, why we could tell them to go out and make the arrest. But if we were taking money from the thing, we would be in kind of an awkward situation. * * * So, I suggested

that we don't participate, partake in any money in this and besides, "We got our own thing going and let's not get hungry."

Braasch agreed.

The original collectors for the "little club" were Cello, Rifkin, Mascolino and Napier, all of whom were Vice Squad officers, and who subsequently testified as witnesses for the Government. Toward the end of 1966 or early 1967, the members of the 18th District Vice Squad held a meeting in the 18th District station house to discuss the functioning of the extortion "club". At that meeting, the officers discussed the procedures to be followed in protecting their "club" members; they discussed the amount of money that would be paid to each vice officer as more bars were recruited; and they discussed which officers would be responsible for collecting the money on each shift.

While Fischer and Barry were Vice Coordinators, Officers Cello, Rifkin, Mascolino, and Napier distributed the money they collected from the bars among the members of the Vice Squad. Cello, Mascolino, Rifkin, and Napier each received approximately $300 and later $500 per month; the other vice men received $150 and later $250 per month as their share of the "package".

Witness Cello testified in the Government's case-in-chief that the conditions for membership were as follows:

The conditions were that they would pay $100 a month to the vice officer that would be collecting. In return, there would be no harassment by members of the vice squad. Under harassment, it would be classified as premise checks, I.D. checks of individuals in the bars. If it was a gay bar, you would not go in there with flashlights and harass the patrons of the bar. You would assist them in any trouble that they have. If you were assigned to make a followup report, in your followup report you would try to make it or slant it in any way or form that would help the tavern owners.

If you received knowledge that there was—any knowledge or any information that VCD was going to come into the district to make a raid on these taverns, you would forewarn them. Also that none of the vice—there would be no individual shakedowns by any individual vice officer on these taverns if a check had to be made on a tavern, it would be checked out first with one of us.

As the years from 1966 to 1970 went on, other Vice Squad officers assisted in the collection tasks for the "little club". In February, 1967, Fischer was promoted and transferred to other duties outside the 18th District. and Barry succeeded him as Vice-Coordinator. Barry took over the duties of intermediary between the "little club" and Braasch, but he received no money from the "little club" operation, his take being the $1,000 heretofore mentioned from the "big club". As indicated above, however, Fischer continued as "bagman" for the "big club" through January, 1969. In 1970, Sergeant Geraghty succeeded Barry as Vice-Coordinator and continued to perform the same services as the latter, except that Geraghty assumed the

monthly responsibility of personally receiving the "package" collected from the "little club" and distributing it among the members of the Vice Squad.

## A. *The Indictment and Trial:*

On December 29, 1972, a sixteen-count indictment was returned against twenty-four Chicago police officers, charging in the first count that they participated in a conspiracy to commit extortion in violation of 18 U.S.C. § 1951 by extracting money under color of official right from the proprietors of the fifty-three liquor establishments comprising the "little club". The remaining fifteen counts of the indictment charged separate violations of 18 U.S.C. § 1623.[4] Each count separately charged one of those named in Count One with making false material declarations to the Grand Jury by appearing before the Grand Jury and falsely denying his participation in the "little club" extortion scheme.[5]

At the trial before Judge William J. Bauer which began on August 13, 1973, the Government presented the testimony of seven police officers who had formerly been assigned to the 18th Police Dis-

4. 18 U.S.C. § 1623 in relevant part provides:
(a) Whoever under oath in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

 \*    \*    \*    \*    \*

(c) An indictment or information for violation of this section alleging that, in any proceedings before or ancillary to any court or grand jury of the United States, the defendant under oath has knowingly made two or more declarations, which are inconsistent to the degree that one of them is necessarily false, need not specify which declaration is false if—
(1) each declaration was material to the point in question, and
(2) each declaration was made within the period of the statute of limitations for the offense charged under this section.

In any prosecution under this section, the falsity of a declaration set forth in the indictment or information shall be established sufficient for conviction by proof that the defendant while under oath made irreconcilably contradictory declarations material to the point in question in any proceeding before or ancillary to any court or grand jury. It shall be a defense to an indictment or information made pursuant to the first sentence of this subsection that the defendant at the time he made each declaration believed the declaration was true.

5. Of the twenty-three defendants who went on trial, eight were charged only in Count One (conspiracy); Police Sergeant Barry, Police Officers Cale, Catalano, Finn, McGee, Salveson, Seno, and Zakoian. The remaining fifteen were charged in Count One and in one of the fifteen individual counts of false declarations to the Grand Jury: Police Captain Braasch, Police Sergeant Geraghty, Police Officers Armstrong, Batastini, Demke, Eshoo, Flagg, Grana, Lazar, Pierson, Russell, Schillinger, Swallow, Troche, and West.

trict. Five of them—Fischer, Cello, Rifkin, Mascolino and DuShane—testified under immunity granted pursuant to 18 U.S.C. § 6002; the sixth, Anthony Corsentino, testified without immunity; and the seventh, Lowell Napier, one of those originally indicted, pled guilty before trial and testified. These officers testified to their own complicity in the "little club" and to the involvement of those on trial. In addition, 48 witnesses were produced by the Government who were owners or employees of the liquor establishments in the "little club"; who testified under a blanket immunity grant, and who asserted that they had personally made payments to the police officers who were collecting extortion money for the Vice Squad. The trial was concluded on October 3rd, and the jury found nineteen defendants involved in the instant appeal guilty, and found four others—Demke, Lazar, Pierson and Troche—not guilty on all charges.

We have read the 6,836-page record and find that it reveals a carefully organized and skillfully operated extortion machine of massive proportions in both membership as well as monetary "take"; which operated over several years and corrupted the entire Vice Squad of the 18th Police District, including its top officials. The testimony of the 48 proprietors and employees of the participating "little club" members established that the extortion payments were made. The testimony of the bagmen Cello, Rifkin, Mascolino and Napier confirmed that they had received the payments and disbursed them to police officers of the Vice Squad as well as to themselves. The testimony of DuShane, who was the police officer assigned to clerical work in the Vice Squad, detailed fiscal arrangements. And the testimony of Fischer explained the organization of the "little club"; why certain officers, such as Cello and Rifkin, were included in the payoff of both the "little" and "big" clubs; and the intimate conversations that he had with Braasch that tied the latter inextricably to the "little club" conspiracy and revealed the depths of venality to which Braasch would stoop to protect his "own thing"—the "big club".[6]

B. *The Issues Tendered Here:*

The appellants raise the following issues, some sixteen in number:

(1) Were the statutory requirements of 18 U.S.C. § 6001 et seq. met in granting immunity to various Government witnesses;

(2) Was it proper for the trial court to have suppressed the orders granting such immunity;

(3) Was the grand jury process abused by calling certain prospective Government witnesses before the grand jury after the indictment was returned;

(4) Did the re-assignment of the case to another judge several weeks before trial but after completion of pre-trial motions violate appellants' constitutional protections;

(5) Did the conspiracy "affect commerce" within the meaning of 18 U.S. C. § 1951;

(6) Was knowledge and intent sufficiently proven;

(7) Was the evidence sufficient to prove Braasch's participation in the conspiracy;

6. Exclusive of the "big club" evidence pertaining to the motivation of Captain Braasch and his various vice coordinators, a number of factors connect each of the remaining appellants to the conspiracy. First, most of them received a monthly share of the "package" after joining the District Vice Squad; second, many participated in the actual collecting of money from the victim bars; third, some participated in the distribution of the "package"; fourth, some names appeared on a list indicating that they received a share for one month in early 1967; and, fifth, some officers attended the Vice Squad meeting in late 1966 or early 1967 at which the "club" and the "package" were discussed at length. The evidence at trial from the representatives of the bars and taverns as well as that from Fischer, Rifkin, Cello, and the other officers who testified for the Government tied each of the appellants to one or more of these factors.

(8) Was the evidence sufficient to prove that Grana's declarations before the Grand Jury were false;

(9) Was the admission of the evidence as to the "big club" improper as to Braasch and Barry and so highly prejudicial to the other appellants as to have denied them a fair trial;

(10) Were the twenty-four defendants and sixteen counts properly joined in the indictment;

(11) Does a police officer's abuse of the power of his official position in order to obtain payments from merchants come within the meaning of 18 U.S.C. § 1951's ban on extortion "under color of official right;"

(12) Was it proper to admit evidence of a similar extortion scheme within the 18th District antedating the conspiracy at bar;

(13) Was it proper to admit evidence showing the state of mind of the extortion victims;

(14) Did other evidentiary rulings result in prejudice to the appellants;

(15) Did the prosecutor's closing argument constitute reversible error because of his references to the evidence tying appellant Grana to the conspiracy; and

(16) Was there an abuse of discretion in the sentences imposed.

The bulk of these issues are either frivolous or controlled by previous decisions and do not merit extended discussion. We will deal with them in the order above outlined.

### C. *Disposition of the Issues:*

#### I.

■■ Appellants claim that the Government failed to comply with 18 U.S.C. § 6002 which, they argue, requires that a witness actually refuse to testify before being granted immunity. Unfortunately for the success of their claim, 18 U.S.C. § 6003(b)(2) specifically authorizes the Government to seek such a grant where the witness "has refused *or is likely to refuse* to testify or provide

other information on the basis of his privilege against self-incrimination." (Emphasis supplied) Appellants also claim that the trial court's immunity orders were too broad, prohibiting the use of the immunized testimony against bar owner-witnesses not only in criminal trials but also in subsequent state administrative proceedings, such as liquor license revocation hearings. However, we need not pass on this difficult question since appellants have no standing to raise the question. United States v. Lewis, 456 F.2d 404, 410 (3d Cir. 1972); United States ex rel. Berberian v. Cliff, 300 F.Supp. 8, 14 (E.D.Pa.1969). *Cf.* Lopez v. Burke, 413 F.2d 992, 994 (7th Cir. 1969).

#### II.

■■ Appellants further claim that suppression of the orders granting immunity to several dozen bar owners violated their Sixth Amendment right to the effective assistance of counsel by being denied important information. The suppression orders were entered by Chief Judge Edwin A. Robson in March of 1973, "[i]n order to encourage further disclosures and in order to protect the personal safety and security of the informers and potential witnesses by concealing their identity." Since, as we have said, a defendant has no standing to contest the propriety of a grant of immunity, it follows that appellants had no right to be present at the immunity hearings nor any right to obtain the identity of Government witnesses by or through being furnished copies of the orders granting immunity. Chief Judge Robson denied appellants' motions to lift the suppression order and we agree with his conclusion on the matter. It also follows that defense counsel had no right to be at the immunity hearings. *Cf.* United States v. Bennett, 409 F.2d 888, 899 (2d Cir.), cert. den. sub. nom. Haywood v. United States, 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed.2d 101 (1969), holding that defense counsel's presence is not required when a prosecutor interrogates a prospective witness in prepa-

ration for trial. Moreover, no possible prejudice could have arisen since a copy of the immunity orders was provided the defense with the Section 3500 material at the conclusion of the direct examination of the first immunized witness and was used by appellants' counsel in cross-examination.

## III.

▮▮ Appellants next complain that the Government abused the grand jury process by calling prospective witnesses before the Grand Jury for the purpose of preparing an already pending indictment for trial. The short answer is that the Government has every right to interrogate witnesses on subjects relevant to a continuing grand jury investigation even when the evidence received may also relate to a pending indictment. Beverly v. United States, 468 F.2d 732, 742 (5th Cir. 1972). Appellants have shown no prejudice from these occurrences and their contention must fail. United States v. Star, 470 F.2d 1214, 1217 (9th Cir. 1972).

## IV.

▮ Appellants next claim that their constitutional protections were violated because of the transfer of the case to another judge. This is frivolous. A litigant does not have a right to have his case heard by a particular judge. United States v. Dichiarinte, 385 F.2d 333, 337 (7th Cir. 1967), cert. den., Mastro v. United States, 390 U.S. 945, 88 S.Ct. 1029, 19 L.Ed.2d 1133 (1968); United States v. Stone, 411 F.2d 597, 598–599 (5th Cir. 1969). The fact that the original judge decided pretrial motions is of no consequence. In central calendar courts that is done every day. United States v. Marachowsky, 213 F.2d 235, 244 (7th Cir. 1954), clearly approves the action of one judge sitting for another to make any order necessary to preserve the rights of the parties.

## V.

▮ Appellants also challenge the technical sufficiency of the Govern-

ment's proof that their conduct "affects commerce" within the meaning of 18 U.S.C. § 1951. At the outset we note that there were no objections to the trial court's instructions as to what constitutes effect on commerce. Section 1951 proscribes extortion which "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce . . . ." As this Circuit held in United States v. De Met, 486 F.2d 816 (7th Cir. 1973), cert. denied, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974):

> Because Congress has seen fit to exercise its full power under the commerce clause, extortionate conduct having an arguably *de minimis* effect on commerce may nevertheless be punished. [486 F.2d at 821, 822]

The record indicates that representatives of eleven Chicago area wholesale distributors of beer and liquor testified as to their purchases of alcoholic beverages from numerous locations outside the state and six other wholesale distributors were included by stipulation. Voluminous sales and purchase records of the establishments in the "little club" were admitted into evidence. The dependence of the Chicago retail liquor establishments upon interstate commerce for a supply of alcoholic beverages was fully covered by the testimony of the Chief of Technical Services Branch of the Office of the Regional Director of the Mid West Region of the Alcohol, Tobacco and Firearms Bureau. It revealed a limited number of distilleries and wine manufacturers located in the State of Illinois during the period covered by the conspiracy. This proof shows that the impact on interstate commerce was substantial rather than *de minimis* Nor is there merit to the further contention that the warehousing of the alcoholic beverages prior to sale severs the interstate nexus. *See* United States v. Gill, 490 F.2d 233, 236 (7th Cir. 1973).

## VI.

▮ Appellants also claim that they did not know of either the extortionate

nature of the conspiracy, the source of the money they received, or the interstate impact of their involvement. It may well be that each of the appellants did not know of the minute details of the operation of the "little club", but once the conspiracy was established—the evidence of which was overwhelming—slight evidence is sufficient to connect a particular participant. *See* United States v. Robinson, 470 F.2d 121, 123 (7th Cir. 1972); United States v. Marrapese, 486 F.2d 918, 921 (2d Cir. 1973); United States v. Nunez, 483 F. 2d 453, 460 (9th Cir. 1973). Each of the appellants were Chicago police officers assigned to the vice squad, except Braasch who was their boss; each received money every month from the "little club" operation, except Braasch, Fischer and Barry; they knew the money was not due them or their office by reason of their official position; the record directly connects most of the officers with the fact that the money came from the liquor establishments since four of them were collectors of it and others were present when money was collected: Armstrong, Batastini, Catalano, Eshoo, Finn, Flagg, Grana, Russell, Salvesen and Seno; the operation of the club was freely discussed among the vice officers; Barry was told all about it when he first became Vice-Coordinator; a meeting of the Vice Squad members was held in the 18th District Police Station for the purpose of discussing the "little club"; and Officer DuShane testified that he had conversations about the "little club" with every vice officer assigned to the District during the time in question. Moreover, during the entire relevant period—3½ years—only three arrests were made by the Vice Squad officers at the 53 bars that were in on the "little club", and after March, 1967, not a single arrest was made by any member of the Vice Squad. In our view the evidence was overwhelming.

## VII.

■ In arguing the insufficiency of the evidence to support his conviction, Braasch specifically attacks the credibility of Fischer. That, of course, was a matter the jury decided against Braasch, and we have no power to set aside their determination on the point. Besides, Fischer was corroborated in large part by Cello, Rifkin, and Napier.

## VIII.

■ Grana claims that the Government failed to prove beyond a reasonable doubt that he made false declarations to the Grand Jury as alleged in Count Seven, relying on Bronston v. United States, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1972). But that case is not apposite, since it involved an ambiguous question and a true but unresponsive answer. The questions put to Grana were not ambiguous nor were his answers unresponsive. Indeed, the latter were unequivocal negative responses to questions probing his knowledge of and participation in the extortion scheme.

## IX.

As we have indicated in our factual resume, the Government introduced evidence concerning a "big club" payoff that was not alleged in the indictment. It was introduced solely for the purpose of establishing intent and motive as to Braasch and Barry's participation in the "little club" conspiracy and the trial court so advised the jury with carefully worded instructions. Braasch and Barry, who received none of the proceeds from the "little club", assert that the jury was so inflamed by this evidence that it convicted them for that crime rather than the one charged in the indictment. The remaining appellants also claim prejudice and assert that the jury was confused by the introduction of this separate and uncharged conspiracy into the case. In response, the Government asserts that Fischer's role as Braasch's "bagman" for the "big club" payoffs—a role later undertaken by Barry—was absolutely necessary to paint the whole picture of the "little club" operation and to explain the motive of Braasch, Fischer, and Barry in approving its organization.

Since Braasch and his Vice Coordinators had their "own thing going", it was necessary to protect that operation, i. e., the "big club". By examining the monthly lists of establishments in the "little club" which were submitted for his approval, Braasch was able to make certain that there would be no conflict between the two operations. Moreover, the record shows that word of the "big club" had gone the rounds of the Vice Squad and there was dissatisfaction because the Vice Squad was not in on the take. It is a reasonable inference that Braasch concluded that unless he took steps to satisfy the Vice Squad, this dissatisfaction would increase as time passed and disclosure of the "big club" would inevitably result.

■■■■ It is well-established that proof of motive is one of the exceptions to the general rule that evidence of "other crimes" not charged in the indictment is inadmissible in the prosecution's case-in-chief. See United States ex rel. Durso v. Pate, 426 F.2d 1083, 1086 (7th Cir. 1970), cert. denied, 400 U.S. 995, 91 S.Ct. 469, 27 L.Ed.2d 445 (1971). As in most questions regarding the admissibility of evidence, trial judges are given wide discretion to balance the proffered item's probative value against its prejudicial effect. See United States v. Gaus, 471 F.2d 495, 499 (7th Cir.), cert. denied, 412 U.S. 938, 93 S.Ct. 2772, 37 L.Ed.2d 397 (1973). We can see no abuse of discretion here.

■■■ True it is that detailed evidence as to a similar, contemporaneous conspiracy has a potentially prejudicial effect, but here that effect was outweighed by the importance of this motive evidence as well as the District Court's cautious and thorough limiting instructions which were delivered to the jury not only at the conclusion of witness Fischer's direct examination but again after witnesses Cello and Murphy testified briefly as to their involvement in the "big club", and for a third time in the final charge to the jury. These instructions specified that the "big club"

evidence was not to be used against any other of the defendants besides Braasch and Barry, and as to them it was only to be considered as it relates to their motive and intent to participate in the "little club" conspiracy charged in the indictment. We have no reason to doubt the effectiveness of these carefully drawn instructions. See United States v. Pauldino, 443 F.2d 1108, 1114 (10th Cir.), cert. denied, Bridwell v. United States, 404 U.S. 882, 92 S.Ct. 204, 30 L.Ed.2d 163 (1971). The jury verdict—in which four of the twenty three defendants were acquitted—itself supports this conclusion.

■■■ Appellant Braasch additionally claims that his constitutional right to be informed of the nature and cause of the accusation against him, guaranteed by the Sixth Amendment, was infringed by the omission of any mention of the "big club" in the indictment. The right to be informed of the accusation is a central right in our constitutional system, but it does not place a limitation on the evidentiary rule which allows the introduction of "other crimes" evidence in the proper circumstances. Cf. McConkey v. United States, 444 F.2d 788, 789 (8th Cir.), cert. denied, 404 U.S. 885, 92 S.Ct. 223, 30 L.Ed.2d 168 (1971). Here the Government notified counsel for Braasch on August 27th, some two weeks before Fischer testified—and weeks before it closed its case—that it would introduce just such evidence pertaining to his involvement in uncharged criminal conduct in order to prove his motive for participating in the "little club". United States v. Baum, 482 F.2d 1325 (2d Cir. 1973), on which appellant Braasch relies, is therefore distinguishable since appellant had both notice and opportunity to meet the Government's proof of concurrent criminal conduct.

### X.

■■■ Appellants argue that it was prejudicial under Fed.R.Crim.P. 14 to join the conspiracy count which names

all of the 24 conspirators, with the 15 separate perjury counts, each of which named a single conspirator. They rely on the panel opinion in United States v. Pacente, 490 F.2d 661 (7th Cir. 1973), which reversed the convictions of a Chicago police officer on a similar indictment charging both extortion and perjury. Since the time that briefs were submitted in the present case, however, an *en banc* reconsideration of the *Pacente* opinion has resulted in its reversal, United States v. Pacente, 503 F.2d 543 (7th Cir. 1974), so that such a joinder has now been given full approval by this circuit. Moreover in the instant case, the trial judge in his charge specifically instructed the jury to give separate consideration to each count and to render separate verdicts on each defendant. The charge admonished the jury further that each defendant was entitled to have his guilt or innocence determined from his own conduct and from the evidence as applied to him as if he were being tried alone and that *the guilt or innocence of any one defendant should not influence the jury's verdict respecting the others.* Further, with regard to the perjury counts, the charge instructed that testimony introduced as to them was to be considered only as evidence of the false material declaration charge and that the jury should not consider that testimony as evidence of any defendant's guilt as to Count One of the indictment. The fact that the jury found four of the defendants not guilty on both the conspiracy and the respective perjury counts showed that they not only knew what they were doing but did what they intended. *See* United States v. Gill, 490 F.2d 233, 239 (7th Cir. 1973). We add that the massive duplication of effort entailed in separate trials is not justified absent a more specific claim of prejudice than the one now urged by appellants. *Cf.* United States v. Haim, 218 F.Supp. 922, 932 (S.D.N.Y.1963); United States v. Verra, 203 F.Supp. 87, 90 (S.D.N.Y.1962).

Some of the appellants contend that the joinder of so many defendants in a single indictment deprived them of the privilege of calling a co-conspirator to the stand to testify in their behalf. None of the appellants, save Braasch, attempted to make any positive showing of either the utility or the availability of such testimony. As this circuit has held again and again "[t]he unsupported possibility that such testimony might be forthcoming does not make the denial of a motion for severance erroneous". United States v. Kahn, 381 F.2d 824, 841 (7th Cir.), cert. den., 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661 (1967). Braasch claims that his co-defendant Barry could have testified that Fischer (the Government's star witness against Braasch) told Barry that he (Fischer) had denied to the Government any involvement in any extortion scheme, stating to Barry further: "They [the prosecutors] want Braasch and the only way I could give them Braasch is to lie". However, when the trial judge held an in-chambers *voir dire* on the matter, Barry invoked the Fifth Amendment and refused to answer all questions, including whether he would testify on behalf of Braasch in a separate trial if severance was granted. The facts here are, therefore, a far cry from the leading case of United States v. Echeles, 352 F.2d 892 (7th Cir. 1965), where a co-defendant repeatedly offered to give obviously exculpatory testimony. Barry's refusal to give such assurance left Braasch without that one element which was essential to his motion for severance. *See* United States v. Johnson, 426 F.2d 1112, 1116 (7th Cir. 1970); United States v. Caci, 401 F.2d 664, 672 (2d Cir. 1968).

## XI.

The appellants assert that the crime, if any, charged and proven here is not cognizable under the provisions of the Hobbs Act utilized in the indictment, i. e., extortion "under color of official right". Extortion "under color of official right" as used in the Act, they say, means either the acceptance of money by a public official to perform an act that he was already under a legal duty to

perform or, alternatively, the taking of money under a claim by the officer that he had an official right to the money by virtue of his office. Here, they urge, the proof showed only that the appellants took money to refrain from performing their duties and thus their conduct could not be included in the statutory phrase "under color of official right", but instead "constitutes classic bribery", citing People v. Dioguardi, 8 N.Y.2d 260, 203 N.Y.S.2d 870, 168 N.E.2d 683 (1960), and other New York cases. Pursuing this line of argument, appellants contend that there was a fatal variance between indictment and proof since the conduct proved did not fall within the "official right" extortion charged and the Government failed to charge them with the other type of extortion covered by the first clause of 18 U.S.C. § 1951(b)(2)—extortion by the wrongful use of actual or threatened force, violence or fear.

■■■■ Appellants, however, overlook the fact that the evidence shows that the conspirators used the power and authority vested in them by reason of their office to obtain money not due them or due the office. The use of office to obtain payments is the crux of the statutory requirement of "under color of official right", and appellants' wrongful use of official power was obviously the basis of this extortion. *See* United States v. Staszcuk, 502 F.2d 875 (7th Cir. 1974). It matters not whether the public official induces payments to perform his duties or not to perform his duties, or even, as here, to perform or not to perform acts unrelated to his duties which can only be undertaken because of his official position. So long as the motivation for the payment focuses on the recipient's office, the conduct falls within the ambit of 18 U.S.C. § 1951. That such conduct may also constitute "classic bribery" is not a relevant consideration.[7]

■■■■ The police officers of the vice squad harassed bars, taverns and liquor establishments through their official position by making unusually frequent premise checks (four times a day) and identification examinations of patrons; they inspected bars catering to homosexuals with flashlights and harassed the patrons; they individually "shook down" proprietors often; they set-up under-aged drinkers in bars in order to frame a violation of law; and they sent liquor licensing authorities false reports about bars resulting in cancellations. In short, a set of roving police officers preyed upon the vulnerable position of the bars in the 18th District for their own profit. The proprietors wished to stop this sort of harassment, and the payment of "protection" money appeared to be the only answer. It may be that some of the payments were made from fear of economic harm which does come within the type of coercive extortion prohibited by the first clause of 18 U.S.C. § 1951(b)(2) and not by the clause relating to extortion "under color of official right".[8] Neverthe-

---

7. As appellants themselves point out, "the modern trend of the federal courts is to hold that bribery and extortion as used in the Hobbs Acts are not mutually exclusive. United States v. Kahn, 472 F.2d 272, 278 (2d Cir. 1973), cert. den., 411 U.S. 982, 93 S.Ct. 2270 [36 L.Ed.2d 958]."

8. It may be true that duress is an essential element of a case prosecuted under the provision of the Hobbs Act relating to "wrongful use of actual or threatened force, violence, or fear", but coercive extortion is not the only type outlawed by the Act. The other is inducing payoffs "under color of official right"; and that offense does not re-quire proof of coercion. Few cases have dealt with the distinction between these offenses, but several are relevant. *See* United States v. Kenny, 462 F.2d 1205 (3d Cir.), cert. den., Murphy v. United States, 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972). *See also* United States v. Nardello, 393 U.S. 286, 89 S.Ct. 534, 21 L.Ed.2d 487 (1969), (Warren, C. J.) (discussing labels and classification of extortion offenses by the states); Bianchi v. United States, 219 F.2d 182, 193 (8th Cir.), cert. den., 349 U.S. 915, 75 S.Ct. 604, 99 L.Ed. 1249 (1955); United States v. Sutter, 160 F.2d 754, 756 (7th Cir. 1947); United States v. Hyde, 448 F.2d 815, 832–834 (5th Cir. 1971), cert. den. 404 U.S.

less, it was appellants' misuse of the power of their office that triggered the harm as well as the payments in this case and made it the type of extortion charged in the indictment. We must, therefore, reject their contention.

## CONCLUSION

We have carefully considered the remaining issues raised by appellants regarding admissibility of background, state of mind and other evidence, the prosecutor's closing argument, and the trial judge's sentencing of appellants. We find these claims without merit and therefore affirm the judgment.

Affirmed.

1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972); United States v. Pranno, 385 F.2d 387, 390 (7th Cir. 1967), cert. den., 390 U.S. 944, 88 S.Ct. 1028, 19 L.Ed.2d 1132 (1968); United States v. De Met, 486 F.2d 816, 823 (7th Cir. 1973), (Swygert, C. J., concurring). Here, the Congress intended to and did exercise all of its power under the Constitution, and the Act is to be construed broadly. United States v. Pranno, 385 F.2d at 389. *See also* Stern, "Prosecutions of Local Political Corruption Under the Hobbs Act: The Unnecessary Distinction Between Bribery and Extortion"; 3 Seton Hall L.Rev. 1 (1971).