**UNITED STATES of America, Appellee,**

v.

**J. Richard BARBER, Appellant.**

No. 79–5278.

United States Court of Appeals,
Fourth Circuit.

Argued May 8, 1981.

Decided Jan. 14, 1982.

Rehearing and Rehearing En Banc
Denied March 19, 1982.

Rebecca A. Baitty, Charleston, W.Va. (Rudolph L. Di Trapano, Di Trapano, Jackson & Buffa, L.C., Timothy N. Barber, Charleston, W.Va., on brief) for appellant.

Rebecca A. Betts, Asst. U.S. Atty., Charleston, W.Va. (Wayne A. Rich, Jr., U.S. Atty., Marye L. Wright, Asst. U.S. Atty., Charleston, W.Va., on brief) for appellee.

Before BUTZNER and MURNAGHAN, Circuit Judges, and RAMSEY *, District Judge.

MURNAGHAN, Circuit Judge:

J. Richard Barber was, from 1969 on, an official of the West Virginia Alcoholic Beverage Control Commission ("ABCC") rising in April, 1973 to the top position of Commissioner, which he held until at least September, 1976. An indictment was returned against him on May 2, 1979. Barber was convicted of violating the Racketeer Influenced and Corrupt Organization ("RICO") statute, 18 U.S.C. § 1962(c) (one count), the

* The Honorable Norman P. Ramsey, United States District Judge for the District of Maryland, sitting by designation.

Hobbs Act, 18 U.S.C. § 1951 (six counts), and the mail fraud statute, 18 U.S.C. § 1341 (thirteen counts). He was sentenced on each count to three years imprisonment, all impositions to be served concurrently.

At trial, the government introduced evidence to show that Barber used his position as ABCC Commissioner to obtain free liquor for himself and numerous high officials of the state, and that he solicited and accepted cash payments from certain liquor companies. According to the government's proof, the Commission, which held a monopoly on alcoholic beverage sales in West Virginia, maintained a "withdrawal" system whereby liquor company representatives could, for business promotional purposes, withdraw liquor from the state's warehouse (the liquor having already been paid for by the state), and then reimburse the state for its withdrawal.

Prior to 1970, when the defendant became Acting Commissioner, the Commissioner began using the system in reverse. Utilizing the same ABCC documents, the Commissioner himself began to withdraw liquor and to obtain "authorization" from the liquor companies after-the-fact. The companies would then be billed by the warehouse for the withdrawn quantities, although they found their way, not to the companies, but to destinations designated by the Commissioner.

The proof at trial also permitted a finding that during 1975 and 1976 Barber manipulated the "breakage" system in a similar fashion. Normally, when a shipment included damaged products, the warehouse would send an "Affidavit Concerning Damage" to the concerned company, which thereupon absorbed the breakage loss. According to trial testimony, Barber, with respect to two of the companies, manipulated the breakage system by setting aside for his own use salable merchandise, but reporting it to the company concerned as breakage.

Finally, the defendant was charged with soliciting and accepting thousands of dollars in bribes from certain liquor companies. One witness, for example, testified that, in response to a plea for a political contribu-

tion, American Distilling Company authorized him to give Barber $1,000, which the witness then delivered in cash to Barber in a white envelope.

On September 17, 1975, Barber was interviewed by an FBI agent concerning his knowledge of campaign financing during the 1972 gubernatorial election. The FBI prepared a summary of the interview on an "FBI 302" form. Subsequently, in December, 1975, Barber was subpoenaed by a grand jury investigating Governor Arch A. Moore. Again he was interviewed, this time by the United States attorney, with an FBI agent present. Again an FBI 302 form was prepared. Barber also testified before the grand jury. The trial judge found that, on December 11, 1975, the then United States attorney "implicitly assured" Barber and his attorney that his responses to questions in the September and December, 1975 interviews and the December, 1975 grand jury hearing "would not be used against him either directly or through leads gained therefrom."

On appeal, Barber raises several arguments, ranging from whether the "taint" of the use immunity of his testimony affected the government's preparation of the indictment and prosecution of him, to the sufficiency of the evidence to convict him, to the charge that he was selectively prosecuted, and finally to the contention that for various reasons he was denied a fair trial.

## I. *"Use" Immunity Question*

In May, 1978, *after* the government began investigating Barber's conduct as Liquor Commissioner, the 1975 FBI 302 forms summarizing Barber's interviews (for the contents of which Barber had been granted use immunity) were discovered by agents of the United States involved in the investigation. Barber contends that the government failed to rebut the presumption that the investigation was tainted by the May, 1978 discovery and knowledge of the contents of the 1975 interviews. Therefore, he argues, the entire indictment should have been dismissed.

Defendant's contentions must be rejected. First, the inculpatory statements made in the 1975 interviews all relate to acts involving the 1972 election and Barber's use of his office to raise money for the governor's campaign war chest. The thrust of several counts in the instant indictment is, on the other hand, directed towards the quite distinct matter of the defendant's use of the withdrawal system. Thus, even if we should assume that the FBI 302 forms were wrongly used by the government in its investigation of Barber, nevertheless, the information contained in the form could have been of no use with respect to the subsequent liquor withdrawal investigation.

Second, by the time the prosecution gained access to the FBI 302 forms, its investigation was already well under way. The government has satisfactorily demonstrated that, before it became aware of the FBI 302 forms, it had already learned of the matters mentioned in the forms. In apparent recognition of the force of the government's presentation, Barber retreats to the position that the information contained in the forms was the first *confirmation* received by the prosecutors of their independently obtained information that Barber had been involved in the solicitation and collection of campaign funds.[1]

That supposition, however, is refuted by testimony of the FBI agents and government lawyers that they had made no use of the immunized statements. Given that the investigation was already focusing, before the FBI 302 forms surfaced, on all aspects of Barber's use of his office to extract benefits from the liquor industry, it strains credulity to assert that the government would not have uncovered, quite independently of the forms, further confirmation of its strong investigatory leads. The manner in which things evolved downplays any significance of the FBI 302 forms as confirmation.

There is no indication of game playing by the government, no effort to obtain an unfair advantage. Rather papers have again displayed an understandable propensity to get lost in the bureaucratic maze. We conclude that the district judge was justified in his determinations that there simply was no violation of the use immunity conferred on Barber, inasmuch as: (a) the government was unaware of the grand jury transcript for December 11, 1975 until late June of 1979 and had not used it for investigation purposes or for preparation for trial in the present case, and (b) while the government knew of the FBI forms for the September and December 1975 interviews since at least the summer of 1978, the government had satisfactorily established that the immunized statements had not been used in connection with the instant case.

## II. *Selective Prosecution*

■ Barber contends that he was selectively prosecuted. Pointing to the long-standing nature of the withdrawal system, he argues that he was singled out for prosecution because of poor prosecutorial motives. However, the defendant has a heavy burden to prove "invidious discrimination," *United States v. Crowthers*, 456 F.2d 1074 (4th Cir. 1972), based upon an "arbitrary classification," *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 505, 7 L.Ed.2d 446 (1962). That affirmative obligation has not been satisfied. While there was testimony that the withdrawal system existed for years before Barber took over as Commissioner, there was also abundant testimony that the defendant took advantage of the system far more than any earlier Commissioner, and also that Barber's immediate predecessor did not improperly use the withdrawal system.

■ There is simply nothing here pointing to arbitrary, bad faith considerations such as race, religion, or the desire to prevent exercise of constitutional rights. *See,*

---

1. Reliance is placed by Barber on language in *Kastigar v. United States*, 406 U.S. 441, 453, 92 S.Ct. 1653, 1661, 32 L.Ed.2d 212 (1972), prohibiting use of immunized testimony "in *any* respect." (Emphasis in original). *Cf. New Jer-*

*sey v. Portash*, 440 U.S. 450, 459, 99 S.Ct. 1292, 1297, 59 L.Ed.2d 501 (1979) ("*[A]ny* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law.") (Emphasis in original).

e.g., *Crowthers, supra* (First Amendment right to protest); *United States v. Ojala,* 544 F.2d 940 (8th Cir.1976). We have simply the prosecutor's judgment leading to prosecution, and it cannot simply be assumed to have been based on an unworthy motive.

## III. *Sufficiency of the Evidence*

### A. *Hobbs Act*

Barber first argues that his conviction under the Hobbs Act, 18 U.S.C. § 1951, is not supported by sufficient evidence.

The Hobbs Act proscribes extortion, defined, for the purposes here pertinent, as obtaining property from another, with his consent, "under color of official right." The provision has been interpreted so as

not [to] require proof of specific acts by the public officials demonstrating force, threats, or the use of fear so long as the victim consented [to the provision of a benefit] because of the office or position held by the official who obtained the money.

If the public official knows the motivation of the victim focuses on the public official's office and money is obtained by the public official which was not lawfully due and owing to him or the office he represented, that is sufficient to satisfy the requirements of the law of extortion under color of official right.

The mere voluntary payment of money would not constitute extortion.

*United States v. Hedman,* 630 F.2d 1184, 1194–95 n.4 (7th Cir.1980), *cert. denied,* 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981). The line is a fine one between an altogether "voluntary" payment and the conferring of a benefit on someone who holds a particular public office in fear of retaliation or in expectation of benefit. As the defendant points out, if read literally, the *Hedman* language could arguably prohibit a public official from personally soliciting a campaign contribution.[2]

In several other Hobbs Act cases cited by the government, there was some showing that the defendant provided favors or withheld the negative force of his office if the victim made some payment. *See, e.g., United States v. Grande,* 620 F.2d 1026, 1031–32 (4th Cir.1980), *cert. denied,* 449 U.S. 830, 101 S.Ct. 98, 66 L.Ed.2d 35 (1980) (official misused the office to favor the payor by supplying information and channeling contracts); *United States v. Hathaway,* 534 F.2d 386, 394–96 (1st Cir.1976), *cert. denied,* 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976) (payor feared that, without making payment, he would not receive construction contract; the defendant stated he was under pressure to award contract to others, but after payor gave defendant money, payor received contract); *United States v. Braasch,* 505 F.2d 139, 150–52 (7th Cir.1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975) (roving police officers shook down bars that did not pay up).

In the case at hand, there was not much direct evidence as to *why* the liquor companies continued to authorize the withdrawals of liquor by the defendant. On only one of the six Hobbs Act counts was there testimony that the companies acquiesced because the withdrawal practice "was being done with the other distillers and for that reason I did not want to pull out."

Yet, in the circumstances of the case, the absence of direct testimony as to motive is of little help to Barber. It is inescapable that the authorization would not have been given had not Barber been Commissioner. The giving of free liquor in substantial quantities is altogether contrary

---

2. There, however, other public policy objectives intrude, associated with informing the electorate to enhance the possibility of intelligent exercise of the franchise. No such considerations apply to siphoning off alcoholic beverages and affording free access to them by the Commissioner.

Furthermore, asking for a campaign contribution does not typically involve falsification of documents such as took place here. The very fact of such shenanigans bears on the extreme unlikelihood that the liquor companies regarded what they were doing as voluntary rather than compelled—subtly perhaps, but compelled nonetheless.

to custom, unless there is a reason, *i.e.*, an expectation of a *quid pro quo*. When the "donee" is the state's alcoholic beverage chief, the conclusion is irresistible that, absent a convincing explanation, the "gift" was not a gift, but, rather, was in return for favors or for the withholding of punitive measures. No such convincing explanation has been forthcoming here. Its absence provides an adequate basis for an inference that a true gift was not the purpose of the liquor companies, and that, as far as the liquor companies were concerned, there was nothing voluntary about the withdrawals.

The Hobbs Act charges related solely to the withdrawal system that employed "authorization" by the companies involved following the removal by Barber for his own use. Customarily a donor initiates a gift. Ratification of a *fait accompli* is far less likely to reflect a donative intent. The Hobbs Act counts did not involve either the perversion of the "breakage" system, nor did they involve the receipt of sums of cash delivered in plain white envelopes.

Hence, on the evidence, there was a fully adequate basis for a jury finding that the benefits accruing to Barber were not true gifts but rather were extracted, with the donors' consent, under color of official right.[3]

B. *Mail Fraud*

Barber contends that, with respect to the mail fraud counts, there was error both in the instructions to the jury and in the failure of the district judge to direct a verdict because of insufficiency of the evidence to convict. The asserted deficiency in the instructions derives from the claim that there was a need for greater precision in the description of the citizens' right to honest and faithful performance of the defendant's duties.[4] In the light of the matters charged, however, we are satisfied that the language employed clearly and unambiguously spelled out, in a fashion readily understandable, a correct statement of the law.

Turning to the claim of insufficiency of the evidence, we note that the government contended that Barber devised a "scheme to defraud" and used the mails in carrying out the scheme, in violation of 18 U.S.C. § 1341. The falsity of the documents employed and the use of the mails have been convincingly established. Barber contends, however, that, since the companies were not misled by the "inaccuracies" in the withdrawal and breakage forms, no deception occurred. Two responses are in order. First, the use of the "breakage" system clearly involved deception, since notarized forms indicating unsalable merchandise, and, thus, unambiguously false, were sent to the liquor companies. That the companies recognized the deception is no defense to a charge that the scheme was employed to deceive. *See, e.g., United States v. George*, 477 F.2d 508, 512 (7th Cir.1973), *cert. denied*, 414 U.S. 827, 94 S.Ct. 49, 38 L.Ed.2d 61 (1973) ("Since the gravamen of the offense is a 'scheme to defraud,' it is unnecessary that the Government allege or prove that the victim of the scheme was actually defrauded or suffered a loss."); *United States v. Goldberg*, 455 F.2d 479, 481 (9th Cir.1972), *cert. denied*, 406 U.S. 967, 92

---

3. The jury was clearly entitled to find that the companies' motivation for authorizing the withdrawals focused on Barber's office. *United States v. Price*, 617 F.2d 455, 457–58 (7th Cir.1979); *United States v. Braasch*, 505 F.2d 139, 151 (7th Cir.1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975).

4. A scheme to defraud may result in a deprivation of tangibles such as revenue or of intangibles such as the honest and faithful performance of an official's duties. *E.g., United States v. Pintar*, 630 F.2d 1270, 1279–80 (8th Cir. 1980); *United States v. Diggs*, 613 F.2d 988, 998 (D.C.Cir.1979), *cert. denied*, 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 838 (1980); *United States v. Brown*, 540 F.2d 364, 374 (8th Cir. 1976). *See also United States v. Mandel*, 591 F.2d 1347, 1362–64 (4th Cir.1979), *vacated on other grounds by an equally divided court*, 602 F.2d 653 (4th Cir.1979) *(en banc), cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980). The falsified documentation utilized by Barber breached the fiduciary duty Barber owed to the state and its citizens. *See, e.g., Pintar, supra*, at 1280; *Brown, supra*, at 374–75.

S.Ct. 2411, 32 L.Ed.2d 665 (1972) ("It is not necessary to show that reliance of the victim was induced by misrepresentation of the defendant, nor is it necessary to show that the victim was misled.").

■ Second, it is not just the liquor companies who were "deceived." The public, with a strong interest in upstanding conduct in the affairs of a state enterprise, and frustrated of opportunities to monitor those affairs because of the falsity employed, was also deceived by the utilization of forms disguising the true nature of the "breakage" and the "withdrawals."

■ Barber further asserts that, independently of whether they were *deceived*, there was no evidence that either the companies or the people of the state were *harmed* by the system. However, a scheme to defraud a state and its citizens of intangible rights, such as honest and faithful government, may fall within the purview of the mail fraud statute. *See* note 4, *supra.* In addition, while Barber recounts evidence that a majority of the companies considered the withdrawal practice to be a valid "promotional" device, there was also significant evidence that some company officials resented the defendant's excessive withdrawals.

■ Moreover, since many of the companies and officials had themselves been indicted and charged, and some of them convicted, it should not be surprising that they would continue to cry their innocence of wrongdoing from the rooftops and deny that their respective companies were harmed—particularly if they might still be subject to shareholder suits.[5]

## IV. *RICO Count*

■ The language of 18 U.S.C. § 1962(c) requires a showing of the "conduct" of the affairs of an enterprise "through a pattern of racketeering activity." *United States v. Webster,* 639 F.2d 174 (4th Cir.1981), reheard by panel on October 9, 1981, has been modified with respect to the rules applicable to a § 1962(c) charge.

The modification has caused any force in an argument by Barber based on *Webster* to dissipate. The ABCC here, although its affairs were not "advanced" by Barber's activities, nevertheless submitted to the conduct of its affairs through a pattern of racketeering activity. The submission of the ABCC withdrawal and breakage documents was essential to the success of the scheme and clearly involved the conduct of the ABCC's affairs.

In light of our disposition of Barber's onslaught on the Hobbs Act violations, we need not devote attention to the unwarranted assertion that the requirement of "at least two acts of racketeering activity," 18 U.S.C. § 1961(5), was not satisfied.

## V *Cross-Examination of Barber re His Resort to the Privilege Against Self-Incrimination*

■ It needs no extensive discussion to establish that, without a good reason, one should not be asked about the invocation of the Fifth Amendment privilege. *E.g., Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). But abstractions do not dispose of concrete cases. Here, Barber gave a justifiable reason to the prosecutors by testifying that, "had he been afforded the opportunity", he would have stated to the prosecutor his position on the matters in question before he was indicted.

That opened the door for the establishment of the fact that, upon being called before the grand jury, Barber pleaded the Fifth Amendment. We are not impressed by the quibble that he was ready to tell all to the prosecutor but not to the grand jury.

---

5. In any event, that one is forced into a "good" thing is not inconsistent with one's, as a consequence, being harmed, where the "good" thing is illegal, and, as a result, one is or may be convicted of crime. Most of the liquor companies were convicted of misdemeanor charges for giving gratuities for the very activities which led to prosecution of Barber. 27 U.S.C. § 205(c). They, accordingly, were harmed.

That evidence was relevant and proper, in light of Barber's earnest endeavor to establish lack of harm to the companies. *See United States v. Binger,* 469 F.2d 275 (9th Cir.1972).

## VI. Claim of Unfair Trial Because of Jury Partiality

 Juror Payne, on *voir dire*, after first stating that he had no opinion as to the guilt or innocence of the defendant, went on to say that "maybe" an impression that the defendant "might be" guilty had been created in his mind from reading the newspapers, but that he would make his decision from the evidence presented in the case. He explicitly denied having formed an opinion about the case. The trial court refused to strike Payne for cause, even though Juror McPherson was struck for cause when he stated that he had formed an opinion that defendant was innocent, but if the evidence presented should show defendant's guilt beyond a reasonable doubt, he could render a verdict in accordance with the evidence. He acknowledged, however, that his present feeling about the case would be difficult to overcome. McPherson described himself "as firmly convinced" that what Barber was accused of had been going on for many, many years. He thought it all "a political affair," in which Barber was being made the scapegoat. His wife, he acknowledged, felt the same way.

In *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), the Supreme Court reversed a murder conviction where 8 of the 12 jurors admitted on *voir dire* that they thought the defendant guilty but that, notwithstanding their opinions, each thought he could render an impartial verdict. "It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. . . . It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* 366 U.S. at 722–23, 81 S.Ct. at 1642. It should be noted that in *Dowd*, the press had announced the defendant's confession of guilt to several of the murders involved.

On the facts of the present case, reversal is not indicated. It is one thing to say, as McPherson did, that his mind was made up, but he could, with difficulty, be persuaded to change it. It is quite another to say, as Payne did, that, with the saturation newspaper coverage to which those in the vicinity had been exposed, he might have been inclined towards a finding of guilt, but had put any such inclination aside and would consider the evidence as the only basis for his decision. The district judge, present in the courtroom, must deal in inflections, nuances and evanescent impressions not preserved for an appellate bench. We do not regard the court's actions with respect to Jurors McPherson and Payne as inconsistent or as otherwise constituting an abuse of discretion. Exercising our duty to "independently evaluate the voir dire testimony of the impaneled jurors," *Dowd* 366 U.S. at 723, 81 S.Ct. at 1642, we reach the same conclusion.

## VII. Post-Verdict Refusal to Permit Defendant to Interview Two Jurors

 Two jurors, independently of each other, indicated, after trial had been completed and the jurors had left the courtroom, that they were gravely disturbed by the verdict they had participated in reaching. Richard Kinney explained to the judge that he felt anguish over participation in the verdict. The next day he told the judge that he did not think Barber "should have been called guilty the way that he was." Mrs. Hetta Hanshaw told a newspaper reporter that she had been threatened by the foreman of the jury to report her to the judge and that the foreman "scared [her] to death." The law is settled that, following dispersal of a jury, once it has been dismissed, if we allow such attacks by individual members on the composite verdict of all twelve we can expect an unsettling of the system out of all proportion to any expectable improvement in the administration of justice. *See, e.g., McDonald v. Pless*, 238 U.S. 264, 267–68, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915); *Rakes v. United States*, 169 F.2d 739, 745 (4th Cir.

1948), *cert. denied*, 335 U.S. 826, 69 S.Ct. 51, 93 L.Ed. 380 (1948); 3 J. Weinstein & M. Berger, *Evidence* ¶¶ 606[03], 606[04] (1981).[6] The opportunities for other abuses which would greatly exceed the possibly unfortunate consequences of not pursuing belated, post-verdict claims of intimidation by fellow jurors are obvious. In short, on the facts presented in the present case, the cure proposed is manifestly worse than the hypothetical, but unproven, disease.

### VIII. *Juror Beulah James*

▮▮▮▮ Beulah James' brother, George McClaskie, had been tried and convicted of gambling in the district court. On *voir dire*, she indicated that she could reach an impartial verdict. However, the United States attorney failed to disclose to the defense that, at the sentencing of the juror's brother, he, the United States attorney, had spoken on the brother's behalf. Defendant contends that the information should have been revealed. The assumption that Barber would have us draw is that, while Beulah James was probably not grateful to the government for prosecuting her brother, nevertheless she wanted to express her appreciation for the United States attorney's speaking in his behalf.

However, although it was in fact the same United States attorney, it appears that Beulah James did not know who it was who prosecuted her brother.[7] In short, nothing more than a potentially suspicious circumstance had been shown, and something more than such an unverified conjecture is required to justify grant of a new trial. *See United States v. Hendrix*, 549 F.2d 1225 (9th Cir. 1977), *cert. denied*, 434 U.S. 818, 98 S.Ct. 58, 54 L.Ed.2d 74 (1977); *United States v. Mares*, 383 F.2d 811, 812

(10th Cir. 1967), *cert. denied*, 390 U.S. 961, 88 S.Ct. 1060 (1968) ("[A] showing of a possibility of prejudice ... is not enough.").

AFFIRMED.

---

**6.** Fed.R.Evid. 606(b) provides that a juror may not impeach the jury's verdict by testifying "as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to ... the verdict."

**7.** The United States attorney, at *voir dire*, asked the court to inquire "whether she knows which government lawyers were involved in the prosecution of George McClaskie." Mrs. James replied "No sir I don't."

She further replied that, if it should turn out that the United States attorney was the one involved, that would not prejudice her for or against the government.

Those were the last questions put to Beulah James on *voir dire*. Barber's counsel had no questions to ask of her.