UNITED STATES of America,
Plaintiff-Appellee,

v.

David HALL and W. W. Taylor,
Defendants-Appellants.

Nos. 75–1358, 75–1359.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted March 22, 1976.

Decided May 12, 1976.

Rehearing Denied June 8, 1976.

**316**

Mac Oyler, of Oyler & Smith, Oklahoma City, Okl., for defendant-appellant, David Hall.

Emmett Colvin, Jr., of Colvin & Jackson, Dallas, Tex., for defendant-appellant, W. W. Taylor.

O. B. Johnston III, Asst. U. S. Atty., Oklahoma City, Okl. (David L. Russell, U. S. Atty., Drew Neville, William S. Price, Asst. U. S. Attys., and William R. Burkett, U. S. Atty., Oklahoma City, Okl.,on the brief), for plaintiff-appellee.

Before BREITENSTEIN, McWILLIAMS and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

This is a criminal case in which the appellants above named, Hall and Taylor, were convicted of violating the Hobbs Act, 18 U.S.C. Section 1951,[1] and the Travel Act, 18 U.S.C. Section 1952.[2]

The indictment charged offenses against David Hall, W. W. Taylor and R. Kevin Mooney. Mooney, however, entered a plea of guilty and testified against the others. The facts giving rise to the indictments were as follows:

Hall was at the time in question Governor of Oklahoma. W. W. Taylor was president, treasurer and secretary of a corporation called Guaranteed Investors Corporation. Taylor developed a plan to sell ten million dollars in promissory notes of Guaranteed Investors, a newly formed corporation, which notes were to be secured by government guaranteed collateral. Taylor sought to sell these notes to the Oklahoma Employees Retirement System (System). Hall, Taylor and Mooney, the latter being a lawyer for Guaranteed Investors, made an agreement for the plan to be presented to

---

1. Section 1951 provides:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

\* \* \* \* \* \*

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

2. Section 1952 provides in part:

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—
(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.
(b) As used in this section "unlawful activity" means \* \* \* (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

the Chairman of the System's Board of Trustees. Hall did not control the board of the employees retirement system, but he had numerous contacts on the board because he had made appointments of several members of the board. Mooney had brought Hall and Taylor together. Hall agreed to use his influence to sell the plan to the board. He demanded, however, $100,000 to be divided between him and Mooney. Hall contacted John Rogers, Oklahoma Secretary of State and Chairman of the Board of Trustees of the System, and told him that $50,000 would be paid to them, meaning Hall and Rogers, if the Taylor plan was accepted by the board of the employees retirement system. The $50,000 was to be divided equally between Rogers and Hall. Hall then advised Mooney that he (Mooney) was going to pay one-half of the $25,000 which was to be paid to Rogers. True to his word, Hall persuaded the members of the board to approve of the Taylor plan and it did so on December 23, 1974, subject only to a letter of legality from the Attorney General plus a letter of approval from the investment counselor of the board.

The indictment contained six counts. Count 1 alleged that Hall attempted to extort $50,000 from Taylor and Mooney and Guaranteed Investors Corporation in violation of the Hobbs Act, Section 1951, *supra.*

Count 2 arose under Section 1952, *supra.* It charged that the three defendants conspired to travel in interstate commerce and to use facilities in commerce with the intent to promote, manage, and carry on unlawful activity and a scheme to bribe a public officer or officers for the purpose of influencing the board of the Employees Retirement System to invest ten million dollars in Guaranteed Investors Corporation in violation of Section 381, Title 21, O.S.A., and to accept a bribe in violation of Section 382, Title 21, O.S.A., in violation of Section 1952, Title 18 U.S.C.

The count further alleged that the conspiracy also involved the payment of $50,-

000 for which Hall would use his official position to influence Rogers, the Chairman of the Board of Trustees of the System, to call meetings and to gain approval of the sale of the ten million dollars in securities of Guaranteed Investors Corporation.

In Counts 3 and 4, Hall was charged with attempting to bribe John Rogers and with accepting a bribe himself in violation of 21 O.S.A. Sections 381, 382, together with Section 1952 of the Federal Criminal Code.

Counts 5 and 6 charged Taylor and Mooney with attempting to bribe Hall and Rogers in violation of 21 O.S.A. Section 381, together with Section 1952, *supra.*

Previously Taylor had sought to sell his plan through Mooney to the Board of Trustees of the Retirement System, but to no avail. Only after a meeting with Hall in Fort Worth, Texas, at which time Hall told Mooney that he thought his effort should be worth $100,000 which he characterized as a finders fee and which he offered to share equally with Mooney, did things begin to happen.[3] This took place on December 2, 1974, and the next day Mooney told Hall that Taylor approved of the payment. The very same day Hall had his talk with Rogers, at which time he offered to split the $50,000 with him in exchange for his help in getting the Taylor plan accepted. It was some days later that Hall told Mooney that he expected him to contribute a part of his $25,000 to Rogers.

However, Rogers proceeded to the office of the Oklahoma Attorney General and reported the $25,000 offer. He did so on the same day that the offer was made to him. The Attorney General was out and so Rogers related the offer to an assistant attorney general. On December 4, Rogers met with Mr. Derryberry, the Attorney General, and a few days later the two of them met with the FBI. At that time Rogers agreed to monitor conversations by means of a microphone attached to his person and to his telephone. There is evidence that in the days following the described conversations,

---

**3.** Hall wanted his $50,000 share to be paid in four annual $12,500 installments, beginning after he left office.

Hall contacted Rogers and other members of the board of trustees trying to persuade them to approve the plan. Furthermore, in December, Taylor and Mooney met with Rogers, Hall and members of the board on several occasions. At a number cf the meetings with Hall and Rogers, the subject of the payment came up. Finally, on December 23, the board approved the plan subject to the obtaining of a letter of legality from the Attorney General and a letter of commitment from the board.

On December 31, Hall told Mooney that any payment to Rogers was illegal under Oklahoma law and that Mooney should caution Taylor against making any such payments to Rogers. Nevertheless, Taylor and Mooney talked about paying Rogers in the form of a consulting fee and in subsequent conversations they talked to him (Rogers) generally about payments in an effort to gain the release of a commitment letter. Subsequently, Taylor showed a check for at least $25,000 to Mooney, which was payable to him (Mooney) but which was destined for Rogers.[4] He did not turn it over to him. But, finally, on January 13, Taylor advised Mooney that Rogers had agreed to the release without any payment being made. The next day Mooney went to Oklahoma City from Texas. When Rogers handed over the letter, Mooney was arrested. Hall and Taylor were subsequently arrested.

Mooney pled guilty to Count 2 of the indictment, whereupon the government dropped the charges against him which were set forth in Counts 5 and 6. The charges against Hall and Taylor were tried to a jury starting February 24, 1975, and continuing to March 14, 1975. As we have mentioned earlier, Hall was convicted on Counts 1, 2, 3 and 4, whereas Taylor was convicted on Counts 2, 5 and 6. Both sought judgments of acquittal or judgments notwithstanding the verdict or a new trial. These motions were denied.

The several points raised by the appellants include the following:

1. That the indictment was insufficient.

2. That the court erred in its manner of dealing with a juror who became ill after the cause was submitted to the jury for determination.

3. That prejudice requiring reversal resulted from the pretrial publicity.

4. The refusal to give an instruction requested by Hall and Taylor.

5. The inadequate *voir dire* of prospective jurors.

6. The receipt in evidence of certain of the tape recordings.

7. Misconduct of the district attorney.

I.

WHETHER THE INDICTMENT
WAS DEFICIENT

The main objection of both defendants to the indictment arises from the withdrawal of a portion of it as surplusage. In addition, Hall argues that the indictment fails to adequately allege extortion and further contends the indictment was inconsistent in charging him, Hall, with extortion, and Taylor with bribery, offenses which were mutually exclusive and, therefore, failed to give adequate notice of the charge.

A. *Whether the elimination of a charge against Hall was error.*

We consider first whether the court erred in striking a portion of the indictment. The language which was withdrawn is contained in Counts 2, 3 and 4. In Count 2, the conspiracy count, in the process of alleging the object of the conspiracy, it was said "and to accept such bribe in violation of Section 382, Title 21 O.S.A." In Counts 3 and 4 the court struck out or withdrew "and to accept a bribe himself in violation of Section 382, Title 21 O.S.A." In striking the language the judge explained:

I consider this [a] matter of surplusage and I, out of an abundance of caution, fearful that this could be some measure of inconsistency, not as to Taylor neces-

4. All of this activity was designed by Taylor and Mooney as a manipulative effort directed

to persuading Rogers to issue the approval letter.

sarily, but as to Hall, so out of an abundance of caution, and since the courts involved with this, treated as surplusage, will set forth alleged violations of the Statute, I have decided to precede [*sic*] this way in the case. (R. VIII, p. 168) Thus, the trial considered the portion stricken as surplusage subject to deletion without destroying the indictment's validity or depriving the court of its jurisdiction. In denying the motions of Hall and Taylor to dismiss, the court again stated that the withdrawn language was surplusage. Now both defendants renew their attack on the trial court's ruling, arguing that the court improperly amended the indictment and thus invaded their right to be indicted by the grand jury, a right guaranteed by the Fifth Amendment.

■ It is fundamental that an indictment being the product of the grand jury is not subject to amendment. This has long been recognized. *Ex Parte Bain*, 121 U.S. 1, 75 S.Ct. 781, 30 L.Ed. 849 (1886). In the cited case the indictment had charged the defendant with making a false report regarding the condition of a bank with intent to deceive the comptroller of the currency and the agent appointed to examine the affairs of said associations as well as the United States and other persons unknown. The trial court struck the language of "the comptroller of the currency" as surplusage. Following this, the defendant was convicted. The Supreme Court ordered the issuance of the writ of habeas corpus and did so on the ground that the court was without power to make the change and that the result of it was to change the charging part of the indictment. The opinion indicates that any deviation from the rule is fatal.

More recently, in *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), the Supreme Court reaffirmed its holding in *Bain* saying that the latter case had never been disapproved and reaffirmed its holding that a defendant is not to be tried on charges not part of the indictment in its original form. The *Stirone* case was brought under the Hobbs Act and it charged the defendant with utilizing his influence as a union official to interfere with the shipment of raw materials destined for a factory. The trial court there charged the jury that they could convict even though there was interference with finished products rather than raw materials. The Supreme Court regarded this as being not an insignificant variance between allegation and proof. It held that the trial court was powerless to enlarge upon charges contained in the grand jury indictment. It did not, however, rule that a court was unable to *withdraw* charges and thus narrow the defendant's liability.

■ Through the years the *Bain* case has become less absolute in its effect. *See United States v. Dawson*, 516 F.2d 796 (9th Cir.), *cert. denied*, 423 U.S. 855, 96 S.Ct. 104, 46 L.Ed.2d 80 (1975), recognizing that the court may change an indictment as to matters of form or surplusage. Federal Rules of Criminal Procedure 7(d); 8 J. Moore, Federal Practice, par. 7.05(1); 1 Wright & Miller, Federal Practice and Procedure: Criminal Section 127. Also, it is now agreed that courts are able to withdraw from jury consideration counts that are not supported by the evidence. *Salinger v. United States*, 272 U.S. 542, 47 S.Ct. 173, 71 L.Ed. 398 (1926); *United States v. Dawson, supra; Bary v. United States*, 292 F.2d 53 (10th Cir. 1961); *United States v. Griffin*, 463 F.2d 177 (10th Cir.), *cert. denied*, 409 U.S. 988, 93 S.Ct. 34, 34 L.Ed.2d 254 (1972); *United States v. Musgrave*, 483 F.2d 327 (5th Cir.), *cert. denied*, 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 315 (1973); *New England Enterprises, Inc. v. United States*, 400 F.2d 58 (1st Cir. 1968), *cert. denied*, 393 U.S. 1036, 89 S.Ct. 654, 21 L.Ed.2d 581 (1969).

Apart from insufficiency of evidence, the power to *withdraw* charges from the jury is no longer disputed. *Thomas v. United States*, 398 F.2d 531 (5th Cir. 1967); *Overstreet v. United States*, 321 F.2d 459 (5th Cir. 1963), *cert. denied*, 376 U.S. 919, 84 S.Ct. 675, 11 L.Ed.2d 614 (1964). Indeed, the focal point appears to be whether the change involves an expansion or a narrowing of the charges. *See* 8 J. Moore, Federal Practice, par. 7.05(3). *See also* Goldstein,

The State and the Accused: Balance of Advantage in Criminal Procedure, 69 Yale L.J. 1149, 1176–78 (1960). This conclusion is supported by *Salinger v. United States, supra,* wherein the court withdrew a part of the indictment in a mail fraud case on the theory that it was not supported by the evidence.

■ Based upon this analysis, we conclude that there is no ground for complaint in the case at bar. Hall was charged originally with extortion, conspiracy to bribe a public official, bribery and acceptance of a bribe. The net result of the withdrawal reduced the charges to extortion, conspiracy and bribery. In so doing it reduced the charges against Hall. The ruling of the trial judge is supported by *Salinger,* by *United States v. Griffin, supra,* by *United States v. Thomas, supra,* and by *United States v. Overstreet, supra.*

Thus, we see no prejudice to Hall as a result of the action taken by the court. Possible prejudice to Taylor as a result of striking the charges against Hall is even more remote.

B. *Whether the allegation of extortion was sufficient.*

Hall maintains that Count 1 charging him with extortion under the Hobbs Act was insufficiently set forth in the indictment. He says that the indictment fails to allege that he induced anyone to make payments by coercion or under color of official right. He argued this to the trial judge, who rejected it. He makes the same argument here. In our judgment, then, the trial court ruled correctly. The important elements in a Hobbs Act case, according to *Stirone v. United States, supra,* are interference with interstate commerce and extortion. The Act was originally used in cases involving extortion by labor union officials. In more recent times it was used in cases of corruption on the part of public officials. *See United States v. Braasch,* 505 F.2d 139, 150–152 (7th Cir. 1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1562, 43 L.Ed.2d 775 (1975), in which policemen were convicted under the Hobbs Act for carrying out the extortion of money from owners of bars and taverns. The Court of Appeals for the Seventh Circuit upheld convictions in this fact setting, recognizing that the use of public office to obtain payments comes within the part of the Act which provides "under color of official right" since it is the wrongful use of official power which is the congressional intent in using the wording "under color of official right." *See also United States v. Crowley,* 504 F.2d 992, 994–996 (7th Cir. 1974), which involved policemen collecting protection payments, and *see United States v. Stasczuk,* 502 F.2d 875, 877–878 (7th Cir. 1974), *cert. denied,* 423 U.S. 837, 96 S.Ct. 56, 46 L.Ed.2d 65 (1975), where an alderman obtained payments for not opposing amendments to the zoning ordinance. There was an en banc hearing in this case, but it had nothing to do with the "under color of official right" part of the case. The influence of the alderman as being within the "under color of official right" standard was not changed.

Of a similar nature is *United States v. Mazzei,* 521 F.2d 639 (3d Cir.), *cert. denied,* 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975). *See also United States v. Irali,* 503 F.2d 1295 (7th Cir. 1974), *cert. denied,* 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975).

■ These cases show that it is unnecessary that the accused have absolute power to determine the issue. It is sufficient that it is within his jurisdiction (the scope of his office) and that the victim has a reasonable belief that he does have the power. In turn, it is the exploitation of this belief that fulfills the requirement. *Cf. United States v. Braasch, supra,* at 151.

■ At bar we have the governor of a state dealing with a board with which he not only purports to have influence but indeed has influence. He exploited the belief in the victim in order to obtain payments. In doing so he induced payment "under color of official right." Further, the indictment in question is adequate in setting forth the elements of the offense and in giving notice. Hall could not have been

in doubt as to the nature and character of the charge from an ordinary reading of the indictment, and from a reading of the Act he should have been convinced that force, violence or fear were not essential, but that "under color of official right" was an alternative way of violating. *See* 18 U.S.C. Section 1951(b)(2); *United States v. Crowley,* 504 F.2d 992, 994–996 (7th Cir. 1974); *United States v. Kenny,* 462 F.2d 1205 (3d Cir.), *cert. denied,* 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972); *United States v. Mazzei,* 521 F.2d 639 (3d Cir.), *cert. denied,* 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975).

For a case closely similar to the one before us *see United States v. Trotta,* 525 F.2d 1096 (2d Cir. 1975), *petition for cert. filed,* 44 U.S.L.W. 3439 (U.S. February 3, 1976) (Docket No. 75–1032).

In sum, we conclude that the misuse of Hall's office was sufficiently alleged. The indictment said that he attempted to use his office to influence the board's decision and that he had appointed certain members of the board. This, together with the elements of the statute which are set forth, results in the indictment's being sufficient.

C. *The alleged inconsistency.*

Was there logical inconsistency in charging Hall with extortion in Count 1 and in charging Taylor with bribery and conspiracy to bribe in Counts 2, 5 and 6? We conclude that there was not.

■ The question of charging Hall with the acceptance of a bribe need not be considered. We disagree with the argument advanced that bribery and extortion are mutually exclusive. To be sure, they are distinct crimes as shown by *United States v. Addonizio,* 451 F.2d 49, 72–73 (3d Cir.), *cert. denied,* 405 U.S. 1048, 92 S.Ct. 1309, 31 L.Ed.2d 591 (1972); *United States v. Hyde,* 448 F.2d 815 (5th Cir. 1971), *cert. denied,* 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972); *United States v. Kahn,* 472 F.2d 272, 278 (2d Cir.), *cert. denied,* 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973). It cannot be said that in a bribery case there is never an aspect of coercion on the part of

the bribee. The Seventh Circuit has said that such conduct (extortion) may also constitute classic bribery. The *Braasch* court also noted that bribery and extortion are not to be considered mutually exclusive nor does the fact that the alleged victims of the extortion were also bribers nullify anything. *See United States v. Hyde, supra.*

■ So, therefore, charging Hall with extortion and Taylor with bribery was not logically inconsistent. Nor do we see any inconsistency giving rise to the invalidity arising from Hall extorting from Taylor to bribe Rogers because, first, there is no logical inconsistency and, secondly, modern courts refuse to apply these mechanical rules which in years past made for easy but often very unjust decisions.

## II.

### THE ILLNESS OF ONE OF THE JURORS

After completion of the court's charge to the jury and after the court had checked with the jury to determine whether all of the members were in good health, the alternate jurors were discharged and the jury was sequestered. After a full day of deliberation, one of the jurors was not feeling well and permission was sought to stop deliberating at 4:30 p. m. Permission was granted. The following morning at around 5:00 a. m. the juror who had been ill, a Mrs. Dell Meyer, a 65-year-old lady, complained to the bailiff of chest pains. At her request the bailiff called Dr. S. S. Sanbar, her personal physician. On the doctor's advice she was taken to the emergency room of St. Anthony's Hospital and upon arrival at 5:25 a. m. she was placed under the care of a Dr. Kenneth M. Richter, a resident. The usual tests for a suspected heart attack were performed and although some irregularities in enzyme levels were found, the doctor's diagnosis was that she had tietzes, which in plain language is an arthritis-like inflammation of the ribs and sternum. The doctor administered a shot of Demerol, 50 mg, around 6:00 a. m., and after consulting with Dr. Sanbar, admitted her to the hospital for observation.

A meeting of counsel with the judge was held in the judge's chambers at 11:30 a. m. Judge Daugherty suggested that there be a stipulation between counsel to complete the case with less than 12 jurors in accordance with Rule 23(b), Fed.R.Crim.Proc. Counsel for the defendants refused and then moved for a mistrial. The judge then stated that he had talked to Dr. Sanbar at 10:30 a. m. and had been advised that the doctor had examined Mrs. Meyer, had said that she would be able to resume her duties at 1:30 p. m. that day, and that he would release her from the hospital for that purpose. Based on that report, the court denied the motion for mistrial and ordered that jury deliberations be resumed at 1:30 p. m.

The trial court did accede to a defense request that the testimony of the doctors be taken in open court. Both doctors testified. Dr. Richter said that in view of the elevated enzyme levels, he thought it wise to admit Mrs. Meyer for observation and stated that he administered the Demerol at 6:00 a. m., and said further that its effects would wear off in three to four hours. He also testified that he did not believe that he administered any medication or that he had observed any physical condition that would impair Mrs. Meyer's mental faculties as of the time of the starting of deliberations.

Dr. Sanbar also testified. He said that he had been Mrs. Meyer's doctor since March 1973, having treated her for high blood pressure and related chest pains. On prior occasions he had prescribed various kinds of medication for her, including Dramamine, Ornex, Bentyl and Valium. He said that Mrs. Meyer had on March 13 at 6:00 p. m. contacted him through a bailiff about her sleep and nervousness problems. He had prescribed a sleeping pill. On March 14 he prescribed Motrin for arthritis pain. He described her enzyme levels as borderline normal or "very slightly elevated." He examined her at around 10:00 a. m. This was in the presence of a bailiff. He concurred with Richter's diag-

nosis that it was an arthritis condition rather than a heart attack. Sanbar said that he had told the judge that he thought she should stay overnight in the hospital, but that at the judge's request said that he would ask her if she felt well enough to resume her duties and she said that she did. He thereupon discharged her from the hospital. Also, he said that Mrs. Meyer took 5 mg of Valium at 12 noon that day. He said he could not give an opinion as to whether this affected her mental processes.

On the basis of the testimony of the doctors, the judge once again denied the motion for a mistrial, saying that there was no support for a finding that Mrs. Meyer could not satisfactorily continue her juror duties as of 1:30 p. m.

Complaint is made that the administration of medication affected Mrs. Meyer's mental processes; that she was medically unfit; and that there was a violation of the sequestration state growing out of the bailiff's failure to report administration of the medication and the trial judge's communication with her through her doctor.

### A. The juror's fitness.

The problem here presented is unlike that which arises when a defendant offers a post-trial affidavit of a juror in an effort to impeach the verdict. In our situation medical testimony is offered in an effort to establish that the juror was unfit for jury duty, whereby the defendants were allegedly denied a juror trial by 12 competent persons.[5] The statutory standard set forth in the note is incapacity by reason of mental or physical infirmity and thus the issue is whether the trial court erred in not finding the existence of incapacity.

 The defendants argue that from the total evidence there arises an inference that the juror lacked fitness physically and psychologically to serve. We disagree. The undisputed evidence given by Doctors Richter and Sanbar is that Mrs. Meyer had

5. Cf. 28 U.S.C. Section 1865(b)(4), not relied on by the defendants, which declares unqualified for jury service any person who "is incapable, by reason of mental or physical infirmity, to render satisfactory jury service."

not suffered a heart attack. Although her physician recommended overnight hospitalization, he did not insist upon it and was governed by her own estimation of her physical condition. Given the fact that she was able to leave on March 14, there was an inference that the doctor was willing to discharge her for the purpose of jury duty. The difference between his account and that which the judge reported is insignificant. There is nothing in the record to even suggest that the doctor considered her incapable of continuing her service or that such continuation might constitute a danger to her health. Accordingly, we are of the opinion that as far as her physical condition was concerned, the evaluation from the evidence and the determination that she was able to continue is not erroneous. The defendants seek to make use of a stipulation tendered by the United States attorney which recited that the juror was physically incapable of continuing. This stipulation was not accepted by the defendants and in our view had no evidentiary value either as a stipulation or admission.

■ Nor do we consider the psychological competency of the juror to be subject to question. As to the contention of the defendant that she was subject to anxiety, there would have to be much more convincing evidence than we have to justify a finding that there existed psychological impairment, for it would have to establish clearly that she was incompetent to understand the issues and to deliberate at the time the services were rendered. *See United States v. Dioguardi*, 492 F.2d 70, 78 (2d Cir. 1974). This goes on the principle that an accused is entitled to a rational juror, but he cannot insist upon a perfect specimen. Citizenry differ in their general mental capacity, stability, anxieties, and ability to deal with stress. The juror could not be regarded as incompetent unless at the time of service she was incompetent to understand the issues and to conduct deliberation. Nothing in the evidence suggested that the juror here was so incapacitated that she did not perform as well as many people do ordinary occupational tasks. *Peterman v. Indian Motorcycle Co.*, 216 F.2d 289, 293

(1st Cir. 1954). As to the drugs, we need only look to the testimony of the doctors that Valium is frequently prescribed for people doing ordinary business. There is no evidence that the mixing of Valium and the Demerol here would have had a cumulative effect.

The fact that Mrs. Meyer returned voluntarily to jury duty is evidence that she had some will and individual determination. In light of all of this, we do not think that there is the kind of clear evidence that would be required. Perhaps the best decision is that of the Second Circuit in *United States v. Dioguardi, supra*. There, subsequent to the case, the conduct of one of the jurors indicated a possible psychosis. Judge Lumbard, the writer of the opinion, noted that the evidence was insufficient to compel an inquiry.

Of a similar nature was *Peterman v. Indian Motorcycle Co., supra*. In this case also the parties sought to show that one of the jurors had symptoms indicating that a psychosis existed. The trial court rejected the contention, saying that the offer of proof was inadequate. This judgment was affirmed.

Also relevant is *United States ex rel. Daverse v. Hohn*, 198 F.2d 934 (3rd Cir. 1952). Here again there was a refusal to hear the claim in a habeas corpus proceeding. In *Jorgenson v. York Ice Machinery Co.*, 160 F.2d 432 (2d Cir. 1947), Judge Learned Hand rejected efforts to allow impeachment of the jury's verdict where the foreman suffered mental distress when his son died during the jury deliberation.

We have considered the decision of this court in *Baker v. Hudspeth*, 129 F.2d 779 (10th Cir. 1942), which is relied on by the defendants. That case does not support defendants' position. We conclude that the contention is lacking in merit.

B. *The alleged violation of sequestration.*

We must reject the contentions that the activities of the U. S. Marshals-bailiffs and of the trial judge were invalid per se. On

the contrary, from what appears in the record the marshals and the judge were cautious in the extreme. None of the acts complained of show any influences.

## C. *Whether the trial court coerced the juror.*

██ Complaint is made that the querying of the juror through Dr. Sanbar constituted coercion or unauthorized communication with a single juror. The trial judge was faced with a difficult situation which made it necessary that he communicate with the doctor and through the doctor with the juror in order to ascertain her condition. The judge was the person best qualified to carry out the inquiry. We see no impropriety in the judge's communicating with the juror through the doctor. What was said does not add up to pressure. *Jenkins v. United States*, 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965) is relied on, but it is not germane, for in that case coercion with respect to arrival of the verdict was exercised toward the entire group. Nor does *Goff v. United States*, 446 F.2d 623 (10th Cir. 1971) support the defendants. Similarly, *Burroughs v. United States*, 365 F.2d 431 (10th Cir. 1966) is entirely distinguishable. In short, the trial court was careful and conscientious in dealing with a most difficult problem. We perceive no error.

## III.

## PREJUDICIAL PUBLICITY?

Hall argues that the trial court did not take appropriate measures to counteract the allegedly prejudicial publicity which appeared prior to his trial. While he urges that the court's denial of his motions for continuance or transfer and for sequestration of the jury during the trial was error, his argument comes down to the adequacy of the *voir dire* of the prospective jurors by the trial judge. Hall contends that the court erred in refusing to allow counsel to ask the questions, in not asking all of the

questions proposed by appellant, and in not questioning the jurors individually with regard to the publicity. He further contends that the *voir dire* as conducted by the court was inadequate.

██ Either the court or counsel may ask questions on *voir dire*, Fed.R.Crim.P. 24(a),[6] and it is the practice in this Circuit for the court to ask the questions. *United States v. Addington*, 471 F.2d 560 (10th Cir. 1973); *Brundage v. United States*, 365 F.2d 616 (10th Cir. 1965). The conduct of the *voir dire* is within the discretion of the court, *Ristaino v. Ross*, 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976); *Ham v. South Carolina*, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973); *United States v. Crawford*, 444 F.2d 1404 (10th Cir. 1971); the court's exercise of that discretion will not be disturbed unless there is a clear showing of abuse. *United States v. Hill*, 526 F.2d 1019 (10th Cir. 1975); *United States v. De Pugh*, 452 F.2d 915 (10th Cir. 1971), *cert. denied*, 407 U.S. 920, 92 S.Ct. 2452, 32 L.Ed.2d 805 (1972). It is the trial judge's duty to insure that the jurors empanelled are competent to serve, and, particularly, that they are impartial. Where there is a possibility that prospective jurors have been exposed to prejudicial publicity, the court must examine with care so as to insure that they are not biased. *Silverthorne v. United States*, 400 F.2d 627 (9th Cir. 1968), appeal after remand, 430 F.2d 675 (1970), *cert. denied*, 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633 (1971); 8 J. Moore, Federal Practice, par. 24.03.

Judge Daugherty asked approximately 19 or 20 questions of the jury array. Included were the general questions which are propounded in most cases. He also asked whether they knew any of the parties, their attorneys, or principal witnesses; whether anyone was employed by the state of Oklahoma and if so, whether that would affect their impartiality; similarly, whether anyone was employed by the federal government; whether anyone or any members of

---

6. "(a) Examination. The court may permit the defendant or his attorney and the attorney for the government to conduct the examination of prospective jurors or may itself conduct the examination. * * * "

the immediate family was in law enforcement or had attended law school. He also inquired whether anyone had read or heard any news accounts of the case; whether anyone had discussed it with persons outside the family; if there had been any discussion within the immediate family and was the juror the object of persuasion by family members; if anyone had formed an opinion; if anyone knew of any reason why she or he could not be fair and impartial; if they could put aside anything they had read, been told, or heard about the case. While all but one of the original 12 jurors had been exposed to news accounts of the case, no one had discussed it with persons outside of the family, and no one had been the object of persuasion. Two stated that they had formed an opinion, and, after a conference at the bench, during which the judge denied a defense request that the two be questioned individually to determine the nature of their opinions, they were dismissed. The court asked the same questions of all replacement jurors.[7]

Prior to the trial, Hall had submitted 27 general questions to be asked on *voir dire* as well as 19 questions, primarily with respect to publicity, to be asked on an individual basis. The court asked most of the first 27 questions [8] but not in the form proposed by appellant.

■ The court did question the jurors regarding their exposure to publicity; its questions were neither so numerous nor detailed as those proposed by Hall. The

trial judge, however, ". . . was not required to put the question in any particular form, or to ask any particular number of questions on the subject, simply because requested to do so by petitioner." *Ham v. South Carolina,* 409 U.S. 524, 527, 93 S.Ct. 848, 850, 35 L.Ed.2d 46, 50 (1973); *United States v. Hill,* 526 F.2d 1019 (10th Cir. 1975); *United States v. Crawford,* 444 F.2d 1404 (10th Cir. 1971). The court is required to ask questions that are adequate to test the jurors' qualifications; it need not ask questions that are cumulative. *Brundage v. United States,* 365 F.2d 616 (10th Cir. 1965). Here, while the court's questions were not so numerous as the appellant's submissions and were not as detailed, they contained the substance of Hall's proposed inquiries. In view of this, the court's action was not an abuse of its discretion.

In sum, the questions propounded by Judge Daugherty were sufficient to test their impartiality. All of the jurors who remained on the panel stated that although they had heard of the case, they did not have an opinion either way; those who had pre-formed opinions were excused by the court.[9]

Appellant's further argument is that the court's refusal to question the jurors individually was reversible error. He relies on *Silverthorne v. United States,* 400 F.2d 627 (9th Cir. 1968), appeal after remand, 430 F.2d 675 (1970), *cert. denied,* 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633 (1971). In *Silverthorne,* the defendant's conviction

---

7. The court acceded to a defense request to ask a replacement juror about her husband's employer. And, following the seating of the initial 12 jurors, but prior to the peremptory challenges, he asked if any party had additional questions to be put to the array. The government had none; Taylor requested that they be asked if they had a prior acquaintance with any of the others. The judge asked the question of the 12 and of all those called as replacements for jurors who were peremptorily challenged. Hall requested that the court ask how many received newspapers published by the Oklahoma Publishing Company and of those, how many received the Oklahoma Journal. The court declined on the ground that the subject was covered by the questions concerning exposure to news accounts and the formation of

opinions. He did ask, however, whether they could put aside any information acquired from news accounts.

8. The court did not ask question 13a ("Has any prospective juror ever been a prosecution witness in a criminal case?") or question 23 ("Has any juror or any member of your family ever held or sought public office?").

9. That three or four of those called as prospective jurors admitted prior opinions indicates that there was no atmosphere here which would have inhibited the admission of bias or led to a "bandwagon effect" once one juror had admitted to an opinion. *Cf. Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

was reversed and remanded on account of the trial court's failure to inquire specifically into the jurors' impartiality. But, in that case, involving criminal charges against the president of a failed San Francisco bank, there was massive, inflammatory pre-trial publicity.[10] In contrast, the news reporting in the instant case was neither virulent nor massive.[11] Moreover, in *Silverthorne,* the prospective jurors had heard of the case; also, 30 percent had formed prior opinions. Here, only three or four of the prospective jurors out of approximately 31 who were questioned had pre-formed opinions. Thus, this case differs from situations like *Silverthorne* where massive, inflammatory publicity has created a hostile climate requiring extremely close scrutiny of the jurors. *E. g., Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *United States ex rel. Bloeth v. Denno,* 313 F.2d 364 (2d Cir. en banc), *cert. denied,* 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143 (1963).[12]

We conclude that although all of the jurors had heard about the case,[13] the judge's questions, his excusing of those with opinions, and their statements of impartiality were sufficient to assure Hall's being tried by an impartial jury. *See United States v. Liddy,* 509 F.2d 428 (D.C.Cir. 1974) (general

questions addressed to the entire array with individual questions put to those with opinions not an abuse of discretion in the trial of a defendant in the Watergate burglary case).

Hall also mentions the denial of his motion for continuance or transfer. Fed.R.Crim.Proc. 21 provides that a criminal case shall be transferred to ,another district "if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district." This determination is left to the discretion of the trial judge. *United States v. Jobe,* 487 F.2d 268 (10th Cir. 1973); *United States v. Smaldone,* 485 F.2d 1333 (10th Cir. 1973). The publicity here was not such as to call for a transfer, and the court, therefore, did not abuse its discretion in denying Hall's motion.

Finally, Hall mentions the denial of his motion for sequestration during trial. Whether or not the jury is to be sequestered is left to the sound discretion of the trial judge, given the circumstances at the time and place of the trial. *United States v. Hill,* 496 F.2d 201 (5th Cir. 1974); *Blackmon v. United States,* 474 F.2d 1125

10. Over 300 articles appeared in San Francisco newspapers. There was also extensive .television and radio coverage. The news accounts included information about Silverthorne's personal life, speculation about the reasons for the bank's failure, and a story that indicated that the Comptroller of the Currency thought the defendant was guilty.

11. Between January 14, 1975 and January 28, 1975 (about a month prior to Hall's trial), approximately 17 articles which mentioned Hall and the instant case, appeared in four Oklahoma newspapers. The articles were essentially factual reporting, without opinion as to Hall's guilt. Those articles which reported investigations into other offenses mentioned the instant case as a matter of information, without undue emphasis. Since Hall had been under investigation for some time, newspaper articles reporting these investigations had appeared during 1974, but they were not inflammatory.

12. We do not say that it might not have been better practice in view of publicity involving a

public figure to conduct individual *voir dire* of the prospective jurors. *See* ABA Standards Relating to Fair Trial and Free Press, Approved Draft, March 1968, Section 3.4; *see also, United States v. Colabella,* 448 F.2d 1299 (2d Cir. 1971), *cert. denied,* 405 U.S. 929, 92 S.Ct. 981, 30 L.Ed.2d 803 (1972). However, this does not suggest that it was error to fail to do so.

13. "It is not required, however, that the jurors be totally ignorant of the facts and issues involved. * * * To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd,* 366 U.S. 717, 722–723, 81 S.Ct. 1639, 1642–1643, 6 L.Ed.2d 751, 756 (1961).

(6th Cir. 1973), *cert. denied,* 414 U.S. 912, 94 S.Ct. 252, 38 L.Ed.2d 150 (1973). Appellant argues that contacts by a television news reporter with jurors during the trial indicates that the denial of the motion was reversible error. The reporter, however, informed the court immediately after the contact had been made, and a hearing was held at which it was determined that he spoke with two jurors and one juror's mother to ascertain their ages and that nothing was said about the case. While this incident should not have occurred, the prompt hearing assured the court that the jury had not been compromised. There is nothing else in the record to indicate that the jurors had been exposed to outside influences during the trial.[14] We find no abuse.

### IV.

MISCELLANEOUS ISSUES RAISED BY HALL: A. CHALLENGE TO THE ADMISSIBILITY OF TAPE RECORDINGS OBTAINED BY ROGERS. B. ALLEGED PROSECUTORIAL MISCONDUCT

A. John Rogers testified that following the approach to him by Hall he went first to the Attorney General and later to the FBI. Transmitter and recording equipment was attached to his person and telephones by the FBI. As a result, the conversations of Rogers with Hall and other principals in the conspiracy were recorded and were later received in evidence.

The defendants argue that it was error for the trial court to receive these in evidence. This argument is based on the provisions of an Oklahoma statute, 21 O.S.A. Section 1782 which makes unlawful the recording of a telephone conversation with another without that person's permission. It also prohibits the introduction into evidence of the recorded conversations. This statute is in conflict with the federal law governing the interception of wire and oral conversations, 18 U.S.C. Section 2510 *et seq.,* Title III of the Omnibus Crime Control and Safe Streets Act of 1968. Section 2511(2) (18 U.S.C.) provides that:

(c) It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

 Clearly Rogers was acting under color of law and hence he is within the provisions of the quoted provision. Also, it is not disputed that Rogers consented to the recordings. Moreover, the constitutionality of the mentioned provision cannot be disputed. *See Lopez v. United States,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); *United States v. White,* 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971). Federal law as to validity and admissibility governs. In general, the admissibility of evidence in federal criminal cases is governed by federal law. *See United States v. Armocida,* 515 F.2d 49 (3rd Cir. 1975); *Ansley v. Stynchcombe,* 480 F.2d 437 (5th Cir. 1973); *United States v. Teller,* 412 F.2d 374 (7th Cir. 1969).

Hall claims that the government orchestrated interstate calls in order to induce him to engage in illegal activity within the Travel Act. He relies on *United States v. Archer,* 486 F.2d 670 (2d Cir. 1973). However, the *Archer* case is not helpful to Hall. It is concerned with virtual entrapment. In the instant case Hall initiated the transaction with Rogers who went to the Attorney General and FBI. In *Archer* the authorities took the initiative. This makes a substantial difference.

 B. The prosecutorial "misconduct" which is relied on is not misconduct considered in individual instances or in its total effect. Examination of the instances relied on does not reveal conduct which would warrant a reversal. *Aiuppa v. United States,* 393 F.2d 597, 601 (10th Cir. 1968) (Murrah, C. J.), *cert. denied,* 404 U.S. 871,

---

14. While we find no prejudice here, we nevertheless would suggest that it would be better practice to have sequestered the jury.

92 S.Ct. 60, 30 L.Ed.2d 114 (1971). *See United States v. Coppola,* 479 F.2d 1153, 1162–63 (10th Cir. 1973).

## V.

### THE SPECIFIC TAYLOR ASSIGNMENTS

A. Whether the trial court erred in not allowing sufficient use of the letter of non-prosecution addressed to Rogers.

B. Whether the trial judge adequately instructed on Taylor's theory of the case.

### A.

■ The so-called Rogers letter was given to Taylor by the United States Attorney. In it the government agreed not to prosecute Rogers for acts or omissions incident to use of political campaign funds. Rogers' problem in the use of campaign funds was unrelated to the transaction that was being tried. The letter was offered by the defense as bearing on the issue of Rogers' consent to the recording of conversations with the defendants. The defense sought to introduce this letter for the additional purpose of affecting Rogers' credibility. In receiving it the court said at first that it was to be considered only as going to the question of Rogers' consent to recording conversations and as to whether Rogers was coerced by the campaign fund inquiry to make the recordings. The court did not instruct the jury, at least to the satisfaction of appellant Taylor, as to the letter's bearing on the credibility of Rogers. However, the court did instruct the jury quite extensively on the subject of the credibility of Rogers as a witness and in our opinion this was sufficient. The jury was told that if they found that the recordings made by Rogers were voluntarily given that the jury could consider their contents as evidence in the case. The court went on to instruct the jury:

> Likewise evidence has been presented herein regarding a Department of Justice inquiry into the knowledge of the witness

John Rogers about a "Special Campaign Fund" in the Office of the Oklahoma State Examiner and Inspector.

> The jury may consider this evidence as the same may or may not in the judgment of the jury have affected the voluntariness of the consent of the witness John Rogers to the interception of oral and telephone communications to which he was a party and which conversations were recorded on tape.

> The jury may also consider this Department of Justice inquiry as it may or may not in the judgment of the jury have brought about any bias or prejudice on the part of the witness John Rogers for or against any party to this litigation.

Having instructed the jury fully about the problem of Rogers' credibility as it might have been affected by the relationship with the federal government, we are unable to see that the failure to specifically mention the letter could be significant. Roger's possible bias, prejudice and coercion were brought to the jury's attention.

We disagree with the argument that Taylor was unduly limited in the treatment of this letter. Taylor's counsel was allowed to cross-examine Rogers at length and in a manner which would test his credibility as a witness by reason of his cooperation with the federal government as it might have been affected by his being the subject of an inquiry.

The court was not restrictive in its charge to the jury as Taylor would have us believe. Rogers was not only cross-examined extensively but the issue was finally argued without visible restriction.

■ In reviewing a question such as this, it is not a matter of whether the defendant was given an instruction in the exact form requested.[15] Rather, the concern is whether his rights were recognized in the court's rulings and in the court's instructions. Considering the transaction in its entirety, and the fact that the trial court modified its original ruling limiting the use

---

**15.** *See United States v. Waters,* 461 F.2d 248, 251 & 251 n.6 (10th Cir.), *cert. denied, sub nom.*

*Robins v. United States,* 409 U.S. 880, 93 S.Ct. 207, 34 L.Ed.2d 134 (1972).

of the letter, we are of the opinion that appellant Taylor was not prejudiced.

There is a failure to show that the disputed issues were withheld from the jury. The court's general instructions with respect to Rogers' collateral problems and the court's general instructions on self-interest and impeachment as being proper subjects for jury consideration brought to the attention of the jury the issue of Rogers' credibility. The failure of the court to single out the letter in connection with its charge on credibility of witnesses does not in our judgment constitute error.

### B.

Appellant Taylor's argument with respect to the failure of the court to submit his theory of the case pertains to his contention that he acted in good faith and in compliance with Oklahoma law and, therefore, the requisite specific intent required under 18 U.S.C. Section 1952, the Travel Act, was lacking. Appellant's requested instructions read as follows:

"VII.

It is necessary for the Government (Plaintiff) to prove that the Defendant knew that his act or acts were in violation of the law of State of Oklahoma as such law has been defined to you. Evidence that an accused acted or failed to act because of ignorance of such law is to be considered by the jury, in determining whether or not the accused acted intending with bad purpose to obey or to disregard the law of Oklahoma (Section 13.04, Devitt & Blackmar, as modified for this case; *United States v. Stagman* (6th Cir., 1971), 446 F.2d 489, 491.)"

"IX.

GOOD FAITH COMPLIANCE
WITH STATE LAW.

You are instructed that while generally ignorance of the law is no defense, where there is evidence of an attempt at good faith compliance with state law such as the law of Oklahoma pertaining to bribery, based upon representations by a principal public official of the State of Oklahoma such may be considered by the jury as to such defendant receiving such representations in determining whether or not the accused acted with specific intent to disobey or to disregard the state law. (*United States v. Stagman* (6th Cir., 1971), 446 F.2d 489)."

"XX.

It is no defense that the offer or promise of money or thing of value was made to the public official with the intent to corruptly influence an official act which is lawful, of even desirable or beneficial to the public welfare, although you may consider the lawfulness, desirability, or benefit to the public welfare, as any other circumstances in the case as it may bear upon the specific intent of a Defendant or his purpose of traveling in or using interstate commerce facilities."

In urging good faith belief in the state law as a defense, Taylor relies on *United States v. Stagman*, 446 F.2d 489 (6th Cir. 1971), wherein the defendant, the operator of a bingo game, had been informed by the Sheriff, Deputy Sheriff and an Assistant Commonwealth Attorney of the county where the game was operated that such games were legal if certain rules were followed. The Sixth Circuit there held that he was entitled to a charge which stated that a finding of specific intent was essential to a verdict of guilty under the Travel Act. It is relevant to consider that during the period of negotiations between Hall, Taylor and Rogers, Taylor received a warning from a co-conspirator that the payments were illegal. Taylor maintains that he inferred from the warning that offers to pay as opposed to making payments were not in violation of the law, but no direct statement to this effect was testified to, so even if we were to follow the decision in *Stagman* it would not call for a good faith instruction in the present case. The trial court's instructions were adequate.

The answer to all of this is that the jury was charged that the government was required to prove specific intent as an element and that this meant more than general intent; further, it was told that the government must prove that the accused

knowingly acted with intent to promote or to carry on or facilitate the promotion and carrying on of the activity of bribery of John Rogers, an Oklahoma public officer, an activity which the accused knew to be unlawful under Oklahoma law, such intent being determined from all of the facts in the case. A further instruction told the jury that an act of bribery is not excused by evidence tending to show that the objectives sought by the bribe may have been desirable or beneficial to the public welfare and that the purpose of the state law making it a crime to bribe a public official is protection of the integrity of acts of public officials against the temptation of an offer or promise of anything of value to influence their official acts.

We recognize that defendant's theory of the case should be presented so long as it states the law accurately and does not appear confusing to the jury. *Cf. United States v. Von Roeder,* 435 F.2d 1004 (10th Cir. 1971); *Beck v. United States,* 305 F.2d 595 (10th Cir. 1962). Also, even when charging the jury as to the defendant's theory of the case, the exact language offered by the defendant need not be followed. *See Elbel v. United States,* 364 F.2d 127 (10th Cir. 1966).

The instructions here were sufficient and comprehensive. They correctly stated the law with respect to both belief and specific intent.

\* \* \*

The judgments of the district court are affirmed.