**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Harold Donald THOMAS, a/k/a Donald Ray Thomas et al.,
Defendants-Appellants.**

**Nos. 79–1217 to 79–1222, 79–1349
and 79–1350.**

United States Court of Appeals,
Tenth Circuit.

Argued June 8, 1980.

Decided July 31, 1980.

Certiorari Denied Nov. 3, 1980.
See 101 S.Ct. 373.

Rehearing Denied in No. 79–1217
Dec. 4, 1980.

---

Wade S. Livingston, Atty., Dept. of Justice, Washington, D. C. (Ronald L. Rencher, U. S. Atty., District of Utah, Salt Lake City, Utah, and William C. Bryson, Atty., Dept. of Justice, Washington, D. C., with him on the brief), for plaintiff-appellee.

Carl E. K. Johnson, Denver, Colo., for defendant-appellant Harold Donald Thomas.

Randall T. Gaither, Salt Lake City, Utah, for defendants-appellants Vera Mason, Lucy Turner, Lorenzo Hubbard and Charles Franklin Himes.

Jerome H. Mooney, Salt Lake City, Utah, for defendants-appellants Billy Charles Harris, Virdia Louise Joshua, a/k/a Birdia Lousie Joshua, a/k/a Birdie Lousie Harris, and Theresa Haynes, a/k/a Teri Thomas.

* The Honorable Jack R. Miller of the United States Court of Customs and Patent Appeals, sitting by designation.

Before BARRETT and DOYLE, Circuit Judges, and MILLER,* Judge.

WILLIAM E. DOYLE, Circuit Judge.

The defendants here appeal convictions of conspiracy to distribute heroin, contrary to 21 U.S.C. Section 846. There was a total of 22 persons indicted, all of whom were charged in the same conspiracy. Some were not, however, tried in the present case. The charge against Jelly Henderson was dismissed before trial. Charles Turner, Adolph Turner and Stephany Klein were not tried. Paula Carney and Clarence Bradley entered pleas of guilty. Dallas Hansen's case was severed during the trial. At the close of the government's case, the court dismissed the charge against Virginia Beavers. Also, at the close of all the evidence, the court dismissed the charge against Sylvester Scott on the government's motion. The jury acquitted Mark Helmuth, Billie Henderson, Lonnie Turner and Willie Williams. Lizette Turner was convicted, but she received a suspended sentence and has not filed an appeal. The remaining defendants who will be identified were convicted and have filed these appeals.

The conspiracy started in March 1977, and continued until July 12, 1978, at which time the indictment was returned to the United States District Court for the District of Utah, Central Division. Twenty-one named defendants and eight unindicted persons were charged with conspiring to distribute heroin contrary to 21 U.S.C. Sections 812, 841(a)(1), 841(b)(1)(A), and 846. The indictment set forth a total of 41 overt acts.

Count II alleged that beginning in March 1977 and continuing to on or about the date of the indictment, Billy Charles Harris, a/k/a Pete Harris, did unlawfully, willfully, intentionally and knowingly engage in a continuing criminal enterprise in that he unlawfully, willfully, intentionally and knowingly violated 21 U.S.C. Sections 812, 841(a)(1), 841(b)(1)(A) and 846, which viola-

tion was a part of a continuing series of violations undertaken in concert with at least five other persons with respect to whom Billy Charles Harris, a/k/a Pete Harris, occupied the position of organizer, supervisor and manager, and from which continuing series of violations he obtained resources, in violation of 21 U.S.C. Section 848(a)(2).

The evidence disclosed the existence of a heroin selling ring which was managed by Harold Thomas and Billy Charles Harris. These two men were shown to have hired and fired the sellers and, in addition, to have supervised not only the distribution but also the supply of heroin in Salt Lake City and Ogden.

In March 1977, the appellant Thomas met Kathryn Young in her room in the Newhouse Hotel in Salt Lake City. He sold her two balloons containing heroin. Jeff Story, who lived in the room with Young, subsequently entered and Thomas sold him two more balloons of heroin. It was then that Thomas asked Young if she would sell heroin for him. This she agreed to do, and Thomas then explained that he would need approval before she could begin work. Thomas left the hotel and returned with Billy Charles Harris. Thomas and Harris took Young out in their car. Harris told her that he needed heroin dealers in Salt Lake City and that if she would deal for him, she could keep 40% of the money from retail sales. This was the starting point, and the widespread heroin selling developed.

Kathryn Young testified to a meeting with Harris, Joshua and Harold Thomas some days after her first encounter with Harris and was told by Harris that he would like to get rid of a larger quantity of heroin on a daily basis. He asked her if she could find someone else to deal. From that time on, she picked up heroin from Thomas and performed other tasks as well. According to her testimony, Hubbard, who was a user of heroin, helped her sell it from her apartment. Also, Perry assisted her in selling it. Sometime in April 1979, she started recruiting dealers to also assist in distributing the heroin.

During the first two weeks of April, Thomas supplied Young and Story with heroin almost daily. In addition to Tom Perry, Young supplied one Clarence Bradley with heroin. Both Perry and Bradley became distributors. Prior thereto, in the latter part of March 1977, Thomas ran out of heroin and he and appellant Haynes left Salt Lake City. For about two weeks, there was no supply. However, Haynes and Thomas returned to Salt Lake City about April 6, 1977, and brought a fresh supply of heroin with them. This they distributed to Young, and Young in turn distributed to the other dealers. During this period, Perry began to receive some of his heroin directly from Thomas.

About April 14, Thomas wired money to California. After April 15, Young flew to Los Angeles where Harris and Joshua supplied her with uncut heroin. This she brought to Salt Lake City about April 20. Thomas and Haynes, aided by Young and Story, cut and packaged the heroin the very night that she brought it back. This heroin was distributed through Young to the dealers, including Perry and Bradley and two new ones, Paula Carney and Frank Himes.

In the last part of April, Thomas and Story distributed heroin to Lizette Turner in Ogden, Utah. On returning to Salt Lake City, they picked up Haynes at the airport. He had just returned from California with a supply of heroin. In the early part of May, Thomas and Story made a second delivery of heroin to Lizette Turner in Ogden, Utah.

Young and Story had been living at the Newhouse Hotel. About May 10, 1977, they moved into the Crossroads Apartments with Thomas and Haynes. A week later, Harris and Joshua also moved into the apartment. They had recently returned from Los Angeles with another new supply of heroin which was cut, packaged and distributed to Carney and Perry, Himes, Lizette Turner and Lucy Turner. Harris and Joshua rented another apartment, and Harris, Thomas, Joshua and Haynes moved there.

On June 4, 1977, Young flew to Los Angeles. There Harris gave her another quantity of heroin to deliver to Salt Lake City. This heroin was cut, packaged and distributed among the same retailers. Soon after this trip, Young entered a drug addiction rehabilitation program in a hospital and while there was not active in the conspiracy. Harris requested Story to take Young's place as the distributor to the street dealers.

Story went to Los Angeles June 11, 1977. There he gave Harris over $3,000 and obtained a quantity of uncut heroin for delivery to Thomas in Salt Lake City. On June 15, 1977, Thomas, Haynes and Story cut and packaged the drug and distributed it to Carney, Perry and Himes.

On June 25, Haynes made another trip to Los Angeles to obtain more heroin. This shipment was distributed in the same way. Also, Story distributed heroin to Lizette Turner, Stephany Klein, Lorenzo Hubbard and also Arnold Gorlick.

The business continued uninterrupted until July 24, 1977. At that time Story was arrested and charged with distributing heroin. The next day, Harris posted bail. He paid the bondsman $2,500 in small bills. After this, Story was not permitted to deal on his own, and several dealers began to obtain their heroin directly from Thomas and Haynes. Story, however, continued to assist Thomas by delivering to Hubbard and Vera Mason. There were several such orders delivered from Story to Mason during this time.

On August 2, 1977, Story moved from the Crossroads to another apartment. There he delivered heroin from Thomas to Carney and appellants Hubbard, Mason and Himes. Thomas Perry helped Story to distribute this quantity. Also, on August 12, 1977, Thomas sold Perry a number of balloons for his own use. Perry purchased 20 more balloons from Harris about this same time. Subsequently, he purchased more orders from Thomas and Harris. Young was released from the hospital August 16, but immediately became a user, and Harris and Thomas resumed supplying her.

In September, Young rented a new apartment for Harris, Thomas, Joshua and Haynes, and they moved from the Crossroads Apartments. Soon after this, Young drove Haynes to a Sears parking lot where she delivered heroin to Himes. Also, she delivered a bag of heroin to Mason at a grocery store parking lot.

On September 19, 1977, Thomas flew to Los Angeles. He returned to Salt Lake City on approximately September 25. Thomas and Young took the narcotics obtained on the trip from the Royal Inn to Thomas' apartment where Young and Story packaged it in about 500 balloons. Thomas took these balloons to a "safe house" where they could be hidden. However, shortly after that, Gorlick discovered where the balloons were hidden and stole them. After discovery of the theft, Harris told Gorlick in a telephone conversation that he would catch up to him and would kill him. After that, Harris flew to Los Angeles and obtained more heroin. Story went to the hospital to be treated for drug addiction, and neither he nor Young resumed participation in the distribution.

There is no dispute about the sufficiency of the evidence, nor is there any dispute as to the existence of a conspiracy. This was established step by step through those witnesses who testified, such as Gorlick, Young, and an undercover agent. These were eye witnesses who were involved in the development of the enterprise from start to finish. The evidence established that the several distributors were connected with the ringleaders, Thomas and Harris.

The contentions which are advanced by the defendants are all alleged trial errors. These alleged errors are:

1. That appellants were prejudiced by a conversation between a juror and a deputy United States marshal.

2. That prejudice was created by the evidence that appellant Harris threatened Gorlick. Following this, one of the jurors asked the marshal whether he could ask a question. The question was whether jurors had anything to fear from the defendants.

The marshal answered that if any anger were to be expressed, it would probably be directed toward a witness rather than a juror. The trial court instructed the jury that they were to consider only the evidence in question, that is, the threat to Gorlick, only as against Charles Harris.

3. That the trial court erred in denying the motion to sever the trial of the other defendants from that of Harris.

4. That it was error for the trial court to deny appellants' request to investigate the possibility of grand jury bias resulting from news broadcasts.

5. That the court's instruction to the jury that net income was not the test for determining whether Harris received substantial income and resources from a continuing criminal enterprise was improper. This arises in connection with the second count against Harris.

Our conclusion is that the court did not commit error in its conduct of the trial and that the judgment must be affirmed.

## I.

### THE MARHSAL'S CONVERSATION

■ The incident complained of occurred on the third day of the trial when the marshal was asked his opinion regarding any potential likelihood that they, the jurors, had anything to fear from the defendants. The reply was that he was sure that they did not, "and that if any anger were to be expressed, it would probably be directed toward someone giving testimony rather than any member of the jury." The juror replied, "well, we wondered about that." The mention of this was made following the testimony of the witness Young that Harris had made the threat to Gorlick.

It is important that the defendant Harris, the main party in interest as to this point, did not seek any relief other than a mistrial or an order excusing the juror, and the defendant Harris opposed the government's request seeking a voir dire inquiry. The trial court denied the motion for mistrial, saying that the juror's conversation did not pose a realistic risk of prejudice so as to

justify a mistrial or severance, and there was no further mention of the matter.

We acknowledge at the outset that conversations between the marshal and jurors regarding matters which pertain to the trial itself are serious and are generally not to be tolerated. The marshal has important functions, but they do not extend to giving advice to members of the jury. Once it became apparent that the juror was inquiring as to whether the jurors had any basis for apprehension or fear, the question should have been reported to the court without the marshal seeking to give an answer. However, we are unable to perceive a prejudicial error in the trial court's manner of handling the matter. At the conclusion of all of the objections made by the several lawyers in the case, the court commented at some length. In the interest of making an evaluation of, or measuring the scope and extent of the problem, we have included all of the judge's comments.

First, the judge noted that conversations such as this go on more often than the courts know about, but in this instance it was not of such a nature as to undermine the ability for determination of the case fairly and impartially; that the jury had been carefully selected, had listened and given its undivided attention to the case. The jury showed that it was very conscientious in various ways, one of which was taking notes.

In its limiting instruction to the jury, which was given the day after the incident described above, the judge said: "The Court will give this instruction before proceeding. Yesterday evidence was received with respect to alleged statements by Mr. Harris with respect to a Mr. Gorlick. . . . The Court instructs you that that evidence is not to be considered in any respect with regard to any of the other defendants. But if considered by you, that is, if weighed and considered by you, only to be considered with respect to defendant Harris on two counts." Thus, the court was careful to admonish the jury that the evidence was admissible only as to Harris and the jury

was to disregard it as to any of the other defendants. Such a cautionary instruction was appropriate under the circumstances.

The ruling of the court constituted a proper exercise of trial court discretion. It is, of course, a big step for a trial court to grant a motion for severance after the trial has commenced. Also, the trial court is understandably reluctant to grant a mistrial. Yet, where the conduct of the district attorney or officer is gross, for example, and the injury inflicted is great, the granting of relief is necessary. But here the court promptly gave a cautionary instruction to the jury and the trial was a lengthy one so that the jury had an opportunity to consider the evidence in question in context and to disregard it as to all of the defendants other than Harris. As to him, it was properly admissible because it had a tendency to establish that he was the ringleader and to establish also the second count of the indictment which was peculiarly applicable to him.

In *Arizona v. Washington*, 434 U.S. 497, 511, 98 S.Ct. 824, 833, 52 L.Ed.2d 717 (1978), the Supreme Court emphasized the breadth of the discretion of the trial court in dealing with a problem such as this one. There the defendant had been found guilty in state trial court. On motion for new trial, it was brought to the attention of the court that the prosecution had withheld from the accused exculpatory evidence. At the beginning of the new trial, defense counsel, in his opening statement, told the jury that evidence had been hidden from the defendant at the first trial. Thereupon, the trial court granted a mistrial. The Arizona Supreme Court refused to review this ruling.

The federal district court in subsequent habeas corpus proceedings ruled that the defendant could not be placed in further jeopardy and ordered the writ to issue. The Ninth Circuit affirmed the judgment of the trial court. The Supreme Court held that since the record provided justification for the trial court's mistrial ruling, that it was unnecessary, in order to be able to try the case again, for the trial judge to have made an explicit finding of manifest necessity.

The Supreme Court said:

Moreover, in this situation there are especially compelling reasons for allowing the trial judge to exercise broad discretion in deciding whether or not "manifest necessity" justifies a discharge of the jury. On the one hand, if he discharges the jury when further deliberations may produce a fair verdict, the defendant is deprived of his "valued right to have his trial completed by a particular tribunal." But if he fails to discharge a jury which is unable to reach a verdict after protracted and exhausting deliberations, there exists a significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors. If retrial of the defendant were barred whenever an appellate court views the "necessity" for a mistrial differently from the trial judge, there would be a danger that the latter, cognizant of the serious societal consequences of an erroneous ruling, would employ coercive means to break the apparent deadlock. Such a rule would frustrate the public interest in just judgments. The trial judge's decision to declare a mistrial when he considers the jury deadlocked is therefore accorded great deference by a reviewing court.

434 U.S. at 509–510, 98 S.Ct. at 832.

The Supreme Court thus took the position that the trial judge's determination to discharge the jury in circumstances such as those presented in *Arizona v. Washington, supra,* "is entitled to special respect." Similarly, the decision of the trial judge in denying a motion for mistrial or severance *in this case* is to be viewed with respect. The question is, of course, whether the judge has exercised sound discretion.

In our opinion, the judge exercised great care in denying the motions which were tendered. The judge's findings show that he weighed the countervailing circumstances with the greatest of care in reaching a conclusion.

The situation in this case is not unlike that which was presented in *Bacino v. United States*, 316 F.2d 11 (10th Cir.), *cert. denied* 375 U.S. 831, 84 S.Ct. 76, 11 L.Ed.2d 62 (1963), wherein the trial court denied a motion for a mistrial. There a juror addressed a question to the clerk of the court during a recess. The juror in question was entering the court building to attend a session of a trial. The juror saw the defendant with several other men at the courthouse entrance as the juror was entering the building. The juror went to the office of the clerk of the court and made several statements to the men in the office. The clerks who were there reported the incident to the court and the judge called in the juror to interview him. Thereafter, the judge called the attorneys into chambers to advise them concerning the incident and what had been done. A transcript was made of the proceedings. The statement by the juror was "How come this fellow [referring to the Defendant] is out on bond. He gave me a dirty look as I came in the building this morning." 316 F.2d at 13. In the presence of counsel, the deputy clerk stated that the juror said "Something about, we are going to have to do something about this Bacino, and I didn't say anything and he said do you know why he is out on bond and I didn't say anything." The court advised the defendant through his attorney that he was to refrain from being in places where the jurors appeared.

The court quoted with approval from an early case, *Mattox v. United States*, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892), in which a bailiff had discussed the case with the jury. On this the court said: "Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." 316 F.2d at 14.

*Baker v. Hudspeth*, 129 F.2d 779 (10th Cir.), *cert. denied* 317 U.S. 681, 63 S.Ct. 201, 87 L.Ed. 546 (1942), was a case in which a complaint had been made that the marshal, when the jury was put in his charge, admonished the members to abide by the re-

strictions put on them and to cooperate in these matters to avoid a mistrial. The court said that it was the duty of the marshal to protect the jury from outside influences and that it was commendable for the marshal to admonish the jury and to ask for their cooperation as long as he did not tend to influence the jury considering the case.

This court considered a somewhat similar although more serious problem in *United States v. Greer, a/k/a Greg Greer*, 620 F.2d 1383, 1980. There the marshal had had a rather lengthy conversation with a juror regarding punishment. The talk had to do with the Youth Corrections Act and eligibility for it. Although the decision was by a divided court, there was general agreement that communications of this kind are regarded as serious and presumptively prejudicial. However, the majority of the court took the position that it did not produce a per se reversible error condition, but that it was prejudicial. The opinion of Judge Barrett emphasized the need for the trial judge to make a careful investigation to ascertain whether prejudice had resulted from the jury conversation. Judge McKay and the undersigned adopted the position that the conversation was of such a character, dealing as it did with the issue of punishment, that it ran counter to the court's instruction and was prejudicial. The judgment of the district court upholding the verdict was reversed.

The conversation in the present case is not to be considered in the same class with that in *Greer*, for here the conversation pertained to security, and the point which the defendants-appellants in this case regard as serious was the possibility that the jurors themselves became apprehensive for their own safety. However, as we have shown above, the trial court here carefully evaluated the statement and concluded that the impact was not serious. The trial court had good reasons for rejecting the arguments which were given. Certainly, a discussion of possible punishment of the defendant such as occurred in *Greer* is far different. It bears a direct relationship to the outcome of the case. Here the relevance tends to be remote.

Finally, from a consideration of the circumstances, including the care exercised by the the trial court in treating the problem, we are convinced that the ruling was not erroneous.

## II.

WAS IT ERROR FOR THE TRIAL COURT TO RECEIVE THE EVIDENCE AS TO THE THREAT GIVEN BY HARRIS CONSIDERING THAT IT WAS INADMISSIBLE AS TO THE REMAINING DEFENDANTS?

Our conclusion is that the trial court was correct.

■ The contention is that the court erred in receiving this evidence as to Harris' statement to Gorlick that he would catch up to Gorlick and kill him for stealing the heroin. It is said that this was so inflammatory that the defendants who were being tried with Gorlick were certain to be prejudiced by it and that Harris was directly prejudiced because the court admitted the evidence against him. It is also argued that the threat was not related to the heroin sales business, and also that it was not related to the defendants other than Harris and thus had a tendency to implicate them since they were being tried with Harris.

The court admonished the jury to consider this evidence only in connection with the separate charge against Harris contained in the second count, that is, the conducting of a criminal enterprise. Furthermore, the government stipulated that the threat was not made in earnest or seriously, and also stipulated that no effort was ever made to carry it out. This being the situation, it is questionable whether the evidence can be regarded as erroneously received or as having been prejudicial either to Harris or the others. True, such evidence has a tendency to have an effect on other defendants, but this threat was singular as to Harris and, on its face, not readily applicable to the others.

The government contends that this evidence was clearly admissible against Harris

since he was contended to be the leader of the organization, and this evidence showed that he was acting as such in a situation in which Gorlick had seriously damaged the business.

It is said that one element of the criminal enterprise charge is a showing that the person charged is occupying a supervisory position. On this basis it is admissible as to Harris even though it shows an offense different from the main charge, and it was nevertheless admissible as bearing on his having conducted the criminal enterprise.

Inasmuch as the trial court limited the evidence regarding the threat to its purpose we do not consider that error was committed.

The principle which governs the admissibility in evidence of similar or other offenses is well defined. Such evidence in the first instance is inadmissible. But the exceptions are numerous. Such evidence is admissible (at common law) to establish plan, scheme, design, intent, motive, the existence of a pattern of behavior, etc. There are a number of cases from this Circuit. *See United States v. Burkhart*, 458 F.2d 201 at 205 (10th Cir. 1972). There the court noted the case of *Niederluecke v. United States*, 21 F.2d 511 (8th Cir. 1927), a stolen motor vehicle case. In that case, Judge Sanborn stressed the need for establishing some clear and logical connection between the alleged similar offense evidence and the case being tried. The similar offense was held to be unrelated in terms of a scheme or causal effect and lacked similarity on its facts. There are numerous other decisions of this Circuit. *See, for example, Moran v. United States*, 404 F.2d 663 (10th Cir. 1968); *Holt v. United States*, 404 F.2d 914 (10th Cir. 1968), *cert. denied* 393 U.S. 1086, 89 S.Ct. 872, 21 L.Ed.2d 779 (1969); *Mills v. United States*, 367 F.2d 366 (10th Cir. 1966); and *Tandberg-Hanssen v. United States*, 284 F.2d 331 (10th Cir. 1960).

Another requisite that is often stressed is that a so-called similar act or offense must be strictly proven by independent evidence. This was brought out by Judge Kennedy in

the case of *Gart v. United States*, 294 F. 66 (8th Cir. 1923). *See Paris v. United States*, 260 F. 529 (8th Cir. 1919).

■ Such evidence, of course, is not admissible to prove that since the defendant had committed the prior similar offense, it was more probable that he was also guilty of the offense with which he was charged. *See Coulston v. United States*, 51 F.2d 178 (10th Cir. 1931).

A good example of similar offense evidence admissibility where offered for the purpose of proving intent is found in *Sanseverino v. United States*, 321 F.2d 714, 716 (10th Cir. 1963), a prosecution for income tax evasion in which similar conduct in prior years was shown.

This court's decision in *United States v. Coppola*, 526 F.2d 764 (10th Cir. 1975), concerned a problem which was not dissimilar from the similar offense question that we have here. The defendant there had been charged with murder of an inmate in a federal penitentiary. This act was allegedly committed in connection with narcotics traffic in the prison. The defendant Coppola was deeply involved in the narcotics traffic and this was allowed to be shown on the issue of motive for the killing. Allegedly, the deceased had withheld heroin from Coppola. Hearsay statements of inmates, which at the time were adopted by the defendant Coppola, were held to be admissible against him. The statements of the inmates who had actually committed the murder made during the conspiracy were to the effect that the defendant Coppola hired them to kill Mr. Hardaway. One Cordova said that Coppola had approached him to do it, and Cordova said that he went ahead and made arrangements with one Molina to have him do it. One of the individuals, Herman, overheard the conversation. The one who had wielded the pipe said that the defendant had hired him to commit the murder. The statements, admittedly hearsay, were held to be admissible because they were shown to have been adopted by Coppola. On the issue of admissibility of evidence of the drug smuggling in the murder trial, we said:

We consider the Hardaway statements in conversations with his wife to be competent evidence. Hardaway was a coconspirator with Coppola in the scheme to bring drugs into the prison, and the fact of his drug-smuggling conspiracy was unquestionably relevant to prove the motive for the murder and murder conspiracy with which Coppola was charged. *See, e. g., United States v. Braasch*, 505 F.2d 139, 148–49 (7th Cir. 1974) (Clark, Justice). The fact that the drug-smuggling conspiracy was not charged in the indictment does not render evidence of it inadmissible.

526 F.2d at 770.

The threat to kill attributed to Harris is even more relevant than the proof of the conspiracy to peddle narcotics within the institution shown in *Coppola*.

There is little question about Harris being one of the leaders in the drug conspiracy here, especially in the light of the threat growing out of the theft of the narcotics. This was evidence which was plainly relevant.

The similar offense rule and its ramifications have not been changed remarkably as a consequence of the adoption of the Rules of Evidence. Rule 404(b) provides:

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The trial court's ruling receiving the evidence was justified.

### III.

### THE CHARGE THAT THE GRAND JURY WAS BIASED

■ At the time that the grand jury was conducting its investigation leading to the present indictment, a television station in Salt Lake City was publishing a series of

reports on the heroin traffic there. The grand jury proceedings reflect that one juror asked a DEA agent about the relationship between the broadcast and the people under investigation. The agent's response was that the station intended to name some of the people discussed by the grand jury in a future broadcast. At the trial the appellants moved to have an inquiry by the court as to whether the grand jury was biased. This was denied. The defendants state that the grand jury may not have been unbiased due to its exposure to the news stories. This falls short of the allegation that the grand jury was biased.

■ Indicted defendants do not have a right to challenge the fairness of the grand jury. We are not saying that there could never be a showing that the grand jury was corrupt and had not followed the law, but we do not have that situation here. The grand jury procedure is limited to investigation and ex parte consideration of evidence presented by the prosecutor. A defendant does not ordinarily have the right to challenge these proceedings because of their ex parte nature. Thus, for example, the accused will not be heard to challenge the competency of evidence before a grand jury.

*Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), considered the question whether defendant was required to stand trial and have a conviction sustained where only hearsay evidence was presented to the grand jury which indicted him. *Costello* was indicted for wilfully attempting to evade payment of income taxes for three years. He was charged with reporting less income than he and his wife actually received during the years in question. Costello filed a motion seeking to inspect the minutes of the grand jury and for dismissal of the indictment. An accompanying affidavit stated that he was convinced that there could not have been any legal or competent evidence before the grand jury which indicted him since he had reported all his income and paid all taxes due. This motion was denied. The case was tried on the net worth increase theory.

Numerous witnesses and exhibits were considered. Also, witnesses were presented who had examined and analyzed the various testimonies and exhibits. Inasmuch as the same investigator testified before the grand jury, it was contended that the only evidence before the grand jury was hearsay. The Court pointed out that if the defendants were allowed to challenge the grand jury proceedings, there would be dire practical consequences. The grand jury, the Court said, endeavored to provide a fair method for instituting criminal proceedings. Referring to the history of the system, the Court said: "Grand jurors were selected from the body of the people and their work was not hampered by rigid procedural or evidential rules." 350 U.S. at 362, 76 S.Ct. at 408. As a result of the system, grand juries acquired the freedom to act independently that could not have been developed under other circumstances.

The Court's final conclusion was that indictments were not open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury. Such a rule would permit a defendant to have a trial within a trial before the trial for the offense proceeded. Such a method, it was pointed out, was not required under the Fifth Amendment. The Court did say: "An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits." 350 U.S. at 363, 76 S.Ct. at 409.

Moore's Federal Practice contains a full and complete discussion of the rules surrounding the grand jury restrictions and limitations. *See* 8 Moore's Federal Practice 6.03[2] (2d ed. 1979).

The defendants are, it is true, seeking to pierce the armor surrounding the grand jury by contending that the grand jury was biased. The fact, however, that the transcript shows that a grand juror asked a question having to do with the television station's inquiry and presentations should not open the door to a trial involving the grand jury proceedings to determine whether bias existed.

The evidence presented is wholly inadequate to justify the demand which is made by the defendants.

## IV.

## WHETHER THE TEST CONTAINED IN THE TRIAL COURT'S INSTRUCTION FOR OPERATING A CONTINUING CRIMINAL ENTERPRISE WAS PROPER

■ The defendant here claims that the definition of substantial income and resources contained in the charge was not necessarily income and hence was prejudicial and requires reversal.

The defendant recognizes that the government is not required to prove the existence of net income under the statute, but argues that the instruction provides an incomplete definition of income and is misleading; also, that the instruction emphasizes income for the entire operation rather than income to the defendant and thus prejudices the defendant. The instruction in question reads as follows:

> The term "substantial income and resources" as used in this case means something real or actual having considerable or ample size or value. "Income and resources" can be simply defined as money received or gained from illegal narcotics transactions. Incidentally, that does not necessarily mean net income. In other words, ladies and gentlemen, you must find that Billy Charles Harris aka Pete Harris, as organizer, supervisor or manager received what any reasonable person would consider as substantial or considerable funds from trafficking in Heroin.

As noted, substantial income is the criterion, and in regard to this the Seventh Circuit in *United States v. Jeffers*, 532 F.2d 1101, 1116–1117 (7th Cir. 1976), reversed in part on other grounds, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977) stated:

> The courts have not taken the "substantial income" requirement as setting some definite amount of profits that must be proven to obtain a conviction for engaging in a continuing criminal enter-

prise. Nor do we think this would be a proper interpretation of the statute. The "substantial income" requirement should be interpreted as a guide to the magnitude of the criminal enterprise. Congress did not seek to punish small-time operators under this section. It sought to punish only those who obtained "substantial income or resources" from a continuing series of drug violations certainly this can be established by substantial gross receipts or substantial gross income . . .

> To set up a definition in terms of net income would be unreasonable. A business can be carried on even though a profit is not realized. The instruction correctly put the emphasis upon cash flow when it told the jury that it was required to find that Harris as organizer, supervisor or manager received substantial or considerable funds from trafficking in heroin.

In our view this was a correct statement of the law and, from a reading of the instruction as a whole, defendant's contention that he suffered prejudice is not apparent.

\* \* \* \* \* \*

The evidence in this case is quite unusual in that the growth of the conspiracy is shown from the date of its inception. Each time that a seller was added to the organization a witness described it, and so the total picture is that of a completely organized illegal enterprise. There was no possibility of error based on insufficiency of the evidence. All aspects of the conspiracy were shown. It was unquestionably under the direction of defendants Thomas and Harris. The alleged errors have to do with mistakes claimed to have been made by the trial court. None of these have materialized.

Therefore, following the careful consideration of the various arguments, it is the conclusion of this court that the judgment should be and the same is hereby affirmed.